## MARIA WORTHINGTON *vs.* THE CHARTER OAK LIFE INSURANCE COMPANY.

The husband of the plaintiff took out a policy of insurance upon his own life for the benefit of the plaintiff, in the year 1854, in a life insurance company

located in the state of Connecticut. The policy contained the usual provision, that if the annual premiums were not paid on or before the times fixed in the policy for such payment, the company should not be liable to pay the sum insured. At the time of taking out the policy the insured resided, and continued to reside till his death, in the state of South Carolina, and the insurance was effected through a local agent of the company in that state. The annual premiums were paid to this agent until 1860, when he was withdrawn, and the premiums for that and the next year were remitted to the company in Connecticut. When the premium for 1862 fell due the state of South Carolina, with the other Southern States, was in rebellion against the general government, and the President of the United States had by proclamation declared a state of war to exist and had forbidden all commercial intercourse between the citizens of the loyal and those of the rebellious states, and from that time till the close of the war in 1865 no premiums were paid on the policy. At the close of the war the insured tendered to the company the amount of the unpaid premiums and interest, but the company refused to receive them or to acknowledge any further liability upon the policy. No further premiums were paid. In 1869 the insured died, and the plaintiff brought a suit upon the policy, claiming the amount of the same, after deducting the unpaid premiums. Held that the insurance company was not liable (Two judges dissenting.)

The payment of the annual premium as it became payable was a condition precedent to any subsequent liability on the part of the insurance company.

By the payment of his first premium the insured acquired the right to insurance for the following year, and a further right, at his option, to make the further payments of premium and receive a corresponding further insurance.

But there was no obligation to make these further payments. They did not constitute a debt in any sense.

The principle that where there is a positive agreement to do a certain thing and it becomes unlawful to do it, the party is excused from performance, has no application to a case where by the contract itself it rests wholly in the option of the party whether to do the thing or not. In such a case no excuse for not doing it is needed.

Besides, the question here is, not whether the insured is excused from performing, but what is the effect of non-performance. The prohibition to pay is not equivalent to payment. The ordinary effect of a non-performance, where the law intervenes to prohibit, is that no obligation is left on either party.

But the law did not absolutely forbid the payment of the premium. It merely prohibited intercourse between enemies. As a consequence payment, which required such intercourse, was incidentally prohibited. If it could have been made without such intercourse it would have been perfectly lawful.

The supposed hardship of the case is not a reason why the equitable rule should be applied that is applied to certain cases of forfeiture. It is not a forfeiture in any proper sense. A man forfeits what is his own. Here the continuance of the insurance was his right only conditionally. The premiums previously paid were in a great measure compensated by the insurance during the several years covered by them. The real loss was small, and the possibility of such a loss must be presumed to have been in the minds of the parties when they made the contract.

And there is no reason for an equitable relief in such a case that does not apply to other cases where the failure to pay grows out of inevitable and unforeseen accident.

Besides, such a rule would work hardship to the insurance company.   The business of life insurance is based on large calculations of risks and averages. If all the persons insured before the war in the rebellious states could now claim the benefit of their policies, such claim would be made only in cases of death or of lives not now insurable, while the better class of risks would take out new policies and save all the intervening premiums.   This would be very unequal.

It cannot be regarded as an implication of the contract that the insurance company should keep an agent in the state during the life of the policy.   Such an inference is not only unwarranted by anything in the policy, but if there had been such an agent in the state during the war all the money received by him would have been appropriated by the hostile power in possession of the state and the company would not have been benefited.

The fact that the war was extraordinary and unlooked for, and so not probably in the contemplation of the parties, cannot be regarded as implying a qualification of the condition of prepayment of the premium.   It was a possible event, and could have been provided for in the policy as well as other possible but improbable contingencies.

It is a rule that in the case of written contracts the law will imply nothing that may not fairly be presumed to have been intended by the parties.

The contract of insurance, when the premium had been paid for a year, became so far an executed contract, and as to the right of the insured to continue the insurance through his life, it was an executed contract.   This right however was of no value except as he complied with the condition as to future premiums.

At the expiration of the year following the last payment of premium, it was an executory contract on his part.

As the duty to pay the premium was not in any proper sense a debt, the payment resting wholly in the option of the insured, the war could not operate merely to suspend the duty as it might have suspended a debt, but by preventing the payment necessarily dissolved the obligation of the insurance company, the payment being a condition precedent to the continuance of such obligation.

ASSUMPSIT on a policy of life insurance; brought to the Superior Court in Hartford County.

The declaration, after stating the corporate character of the defendants, and their location at the city of Hartford, alleged that the plaintiff was on the 14th day of January, 1854, and until his death, the lawful wife of Lewis Worthington, who on that date and until his death resided in Greenville, in the state of South Carolina; that on the said 14th day of January, 1854, the said Worthington applied to the defendants for insurance upon his life for the term of

his natural life, and that afterwards, on the same day, the defendants, by a certain policy of insurance of that date, signed by the proper officers and agents of the defendants, and on the 30th day of January, 1854, countersigned at Greenville, South Carolina, by Thomas B. Roberts, agent of the defendants at said Greenville, which countersigning by the said Thomas B. Roberts was necessary by the terms of the said policy of insurance in order to make the same operative and effectual, and in consideration of the sum of twenty seven dollars and sixty cents to them in hand paid by the said Worthington, the receipt whereof was in said policy of insurance acknowledged, and in consideration of the annual premium of twenty-seven dollars and sixty cents to be paid on or before the 14th day of January in every year during the continuance of the policy, did assure the life of the said Lewis Worthington in the amount of one thousand dollars for the term of his natural life.  And the defendants in and by said policy of insurance did promise and agree to and with the assured, well and truly to pay, or cause to be paid, the said sum of one thousand dollars insured, to the said Maria Worthington, the plaintiff, her executors, administrators or assigns, for her sole and separate use and benefit, within ninety days after due notice and proof of the death of the said Lewis Worthington; and in case of the death of the said Maria Worthington before the decease of the said Lewis Worthington, the said sum of one thousand dollars was to be paid to the children of the said Lewis Worthington, for their use, or to their guardian, if under age, within ninety days after due notice and proof of the death of the said Lewis Worthington, which said writing or policy of insurance was substantially as follows :  [The declaration then set out the policy, which was in the usual form, the only clauses of importance to the question made in the case being the following:  " This policy of insurance witnesseth that the Charter Oak Life Insurance Company, in consideration of the sum of twenty-seven dollars and sixty cents, to them in hand paid, and of the annual premium of twenty-seven dollars and sixty cents to be paid on or before the

14th day of January in every year during the continuance of this policy, do assure the life of Lewis Worthington, of Greenville, in the state of South Carolina, for the sole and separate use and benefit of the said Maria Worthington, in the amount of one thousand dollars for the term of his natural life." "In case the said assured shall not pay the said annual premiums on or before the renewal days hereinbefore mentioned for the payment thereof, then, and in every such case, the said company shall not be liable to the payment of the sum insured, or any part thereof, and this policy shall cease and determine." The declaration then alleged that permission was given to the insured to reside in the southern states; and after negativing all breaches of the conditions of the policy as to residence, travel, employment, and habits of life, and after alleging the death of the said Lewis Worthington, on the 7th day of April, 1869, at said Greenville, the declaration proceeded as follows:]

And the plaintiff says that the proposals, answers and declarations mentioned in said policy of insurance, upon the faith of which said policy of insurance was made, were true in every respect; and that the said Lewis Worthington while in full life had well and truly paid the aforesaid annual premiums to the defendants on or before the several days hereinbefore mentioned for the payment thereof, except as hereinafter set forth.

And the plaintiff says that the said Lewis Worthington paid the aforesaid annual premium to T. B. Roberts, agent of the defendants at said Greenville, in each and every year after the making of said policy, and at the time specified in said policy for said payment to be made, down to and including the payment of January 14th, 1859. That before the next payment became due, to wit, on or about the 1st day of January, 1860, the defendants withdrew their agent from that locality and from the state of South Carolina, and notified the said Lewis Worthington that his policy had been placed on their home or office list for renewal, and that thereafter they should send him notice duly and regularly of the time when the annual premium became due. That he did receive

notice from the defendants of the time when the payments for 1860 and 1861 became due, and that he did remit to the defendants at Hartford the said annual premium due January 14th, 1860, and January 14th, 1861, which payments kept said policy in full force down to January 14th, 1862. And the plaintiff says, that after the notice of the time for the payment due January 14th, 1861, the defendants never notified the said Lewis Worthington that any payment or annual premium was due on said policy. That although the said Lewis Worthington did not receive any notice as aforesaid, yet he was on the 14th day of January, 1862, and on every 14th day of January thereafter, during his life time, ready and willing to pay the several annual premiums specified in said policy to be paid in each year as the same respectively became due and payable, but that he did not, on said 14th day of January, 1862, pay the annual premium then due by the terms of the policy, nor did he pay the annual premium for the years 1863, 1864, 1865 and 1866, nor for any of the years down to his death. That he did not pay the annual premium for the years 1862, 1863, 1864 and 1865, because the then existing insurrection and rebellion against the government of the United States had interrupted and prevented all lawful intercourse by mail or otherwise between said Greenville, where the said Lewis Worthington then was, and the city of Hartford, where the defendants had their office and place of business. And the plaintiff says that, on the 16th day of August, 1861, under the authority of the act of Congress of July 13th, 1861, the President of the United States by proclamation declared that the inhabitants of the state of South Carolina were in a state of insurrection against the United States, that all commercial intercourse between the state of South Carolina and the inhabitants thereof, and the citizens of other states, was and would remain unlawful until such insurrection should have ceased or been suppressed, and that all goods, chattels, wares and merchandize coming from the said state of South Carolina into other parts of the United States without the special license and permission of the President, would be forfeited to the United

States; that such restrictions, prohibitions, and liabilities to forfeiture continued until May 22d, 1865; nor was the town or county of Greenville or the state of South Carolina within the exceptions mentioned in said proclamation. And the plaintiff says that the said Lewis Worthington did not in any way participate or engage in said rebellion and insurrection against the United States. And that soon after the removal of the prohibition of intercourse and the cessation of hostilities, in the year 1865, the said Lewis Worthington applied to the defendants at Hartford to ascertain the amount of back premiums on said policy, and which, for the reasons hereinbefore stated, had remained unpaid, and at the same time offered to pay then the said back premiums to the defendants, together with interest thereon, and offered to do whatever he was bound to do for the preservation or restitution of said policy and of his rights under the same; but the defendants refused to entertain such proposal, or to accept said offer, and denied that said policy was in force. And the plaintiff says that the said Lewis Worthington was ready and willing to pay all of said back premiums, and also the annual premiums that accrued on said policy afterwards and at the time they respectively became due, down to the time of his death, April 7th, 1869. But although the said Lewis Worthington was at all times ready to pay all of said premiums, and several times offered to do so after May, 1865, yet the defendants refused to receive said premiums or any part thereof, and finally neglected to answer his letters, and dropped all communication with him. And the plaintiff says that after such refusal to accept said premiums as aforesaid, to wit, on the 7th day of April, 1869, the said Lewis Worthington died at Greenville, in the state of South Carolina; and that soon after his death the plaintiff applied to. the defendants for the amount of the insurance named in said policy, less the back premiums and interest thereon, which they declined to pay; and that afterwards, to wit, on or about the 1st day of December, 1872, she applied to the defendants for the amount of said insurance, and offered proofs of death of the said Lewis Worthington in due form,

which proofs the defendants received, but refused to pay the amount of said policy less the back premiums and interest thereon, or any part thereof.

And the plaintiff says that after the death of the said Lewis Worthington, to wit, on the 20th day of February, 1873, the plaintiff by her attorney applied to the defendants at Hartford, and demanded the sum of one thousand dollars, being the amount of said policy and offered to deduct the amount of unpaid premiums and the interest thereon, and offered to make any other deduction proper for the plaintiff to make from the amount of said policy by reason of the non-payment of said annual premiums since January 14th, 1861, and offered to wait for the payment of said sum of one thousand dollars less the above deductions the ninety days after said notice and offer of proof of death, being the time specified in said policy of insurance for the payment of the amount named in said policy; but the defendants refused to pay said sum of one thousand dollars, or any part thereof, or the surrender value of said policy, and declared that they would not pay any part of said policy, either on said 20th of February, 1873, or at the expiration of ninety days, as specified in the said policy of insurance.

And the plaintiff says that the said Lewis Worthington in his life-time, and the plaintiff hitherto since the death of the said Lewis Worthington, and at all times and in all things, have observed, kept and fulfilled, all and singular, the articles, stipulations, conditions, matters and things, which are imposed on them or either of them by the terms of said policy of insurance and the conditions making part thereof, except so far as they have been prevented from performing said conditions specified for them to perform, and growing out of said policy of insurance, for the reasons hereinbefore set forth. But the plaintiff says that the defendants, their promises aforesaid not regarding, have never performed the same, and have never paid said sum of one thousand dollars to the plaintiff, nor any part thereof, though often requested and demanded, and particularly on the 20th day of February

1873 ; all which is to the damage of the plaintiff the sum of two thousand dollars, and for the recovery of which with just costs this suit is brought.

The defendants demurred to the sufficiency of the declaration, and the case was reserved upon the demurrer for the advice of this court.

*H. H. Barbour* and *H. S. Barbour*, with whom was *Storrs*, in support of the demurrer.

*First.* By the terms of the policy payment of the annual premium was a condition precedent to the right to recover thereon. The premiums were the consideration for the risk assumed by the defendants, and the plaintiff must show that the premiums have been paid according to the terms of the policy, or that payment has been waived or prevented by the wrongful act of the defendants, or she cannot recover.

The policy was accepted upon the express condition that it would " cease and determine " unless renewed every year during the life of the insured by the payment of the stipulated premium. Such was the defendants' contract as contained in the policy. It is well settled by the authorities that the party insured must, at all events, pay promptly the annual premiums upon a policy like this. *Howell* v. *Knickerbocker Life Ins. Co.*, 3 Rob., 232 ; *S. C.*, 44 N. York, 276.

Furthermore, we claim that the payment of the premiums annually when due is of the essence of the contract itself, for the first clause of the policy reads thus : " This policy of insurance witnesseth that the Charter Oak Life Insurance Company, in consideration of the sum of twenty-seven dollars and sixty cents, to them in hand paid, and of the annual premium of twenty-seven dollars and sixty cents to be paid on or before the 14th day of January in every year during the continuance of this policy, do assure the life of Lewis Worthington, &c." The payment of the first premium insured Worthington's life for one year, and gave him a right to renew the insurance for the next year by paying the same sum on or before the next " renewal day ;" and so on. The term " renewal days " is used in the policy in a later

clause. The payment of the second premium and every sub-sequent one was as essential in order to keep the policy in force, as was the payment of the first; but as if to remove all question as to the meaning of the first clause of the policy, and to make an unmistakeable declaration of the understanding of both parties, the clause referred to as to payment of renewal premiums and the avoidance of the policy by non-payment is inserted. This construction of the policy is just to both parties; the insurer can maintain no action to recover a premium; the insured has the right to pay and keep the policy in force as long as he chooses to pay. If for any cause he is unable to pay the premium, it may be his misfortune, but the insurer should not be held to a construction of the contract not contemplated by either party.

We therefore claim that, after the 14th day of January, 1862, there was no contract in force between the parties; that neither Lewis Worthington nor the plaintiff were under any obligation to pay any money to the defendants, and that the defendants were released from their obligation under the policy. Nothing could be more explicit than the language of the policy on this point, and the following authorities sustain the claim. *Mutual Benefit Life Ins. Co.* v. *Ruse,* 8 Geo., 534; *Ruse* v. *Mutual Benefit Life Ins. Co.,* 23 N. York, 516; Angell on Fire & Life Ins., § 399; *Bradley* v. *Potomac Fire Ins. Co.,* 32 Maryl., 108; *Want* v. *Blunt,* 12 East, 183, 191; *Mulrey* v. *Shawmut Mut. Fire Ins. Co.,* 4 Allen, 116; *Strong* v. *Taylor,* 2 Hill, 326; *Carpenter* v. *Stevens,* 12 Wend., 589; *Owen* v. *Farmers' Joint Stock Ins. Co.,* 57 Barb., 518; *Scott* v. *Avery,* 36 Eng. L. & Eq. R., 1; Opinion of EMMONS, J., in *Tait* v. *N. York Mut. Life Ins. Co.,* U. S. Circuit Ct. in Tennessee; *Robert* v. *N. England Life Ins. Co.,* 1 Disney, 355; *Same* v. *Same,* 2 id., 106; *School District* v. *Dauchy,* 25 Conn., 536; *Dillard* v. *Manhattan Life Ins. Co.,* 44 Geo., 119; *Baker* v. *Union Mut. Life Ins. Co.,* 43 N. York, 283; *Pitt* v. *Berkshire Life Ins. Co.,* 100 Mass., 500; *Taylor* v. *Bullen,* 6 Cowen, 624; *Beadle* v. *Chenango Mut. Ins. Co.,* 3 Hill, 161; *Nightingale* v. *State Mut. Life*

*Ins. Co.*, 5 R. Isl., 38 ; *Deshon* v. *Bigelow*, 8 Gray, 159 ; *Inman* v. *Western Fire Ins. Co.*, 12 Wend., 460 ; *Atkinson* v. *Ritchie*, 10 East, 533 ; *Merchants' Ins. Co.* v. *Edmond*, 17 Gratt., 146, 157.

*Second.* The reasons given in the declaration for the non-payment of the premiums afford no legal excuse for failure to pay as required by the policy. Indeed it was not impossible for the assured to make payment if he wished to keep the policy in force. If he chose to remain where he could not make the payments at Hartford, where they were payable, it was his own fault, and not the fault of the defendants. It was his duty to come within our lines, and was not impossible for him to do so, or at least in someway to make payment. *The William Bagaley*, 5 Wall., 377. In this case the court say, (p. 408,) " The duty of a citizen when a war breaks out, if it be a foreign war, and he is abroad, is to return without delay, and if it be a civil war, and he is a resident in the rebellious section, he should leave it as soon as practicable and adhere to the regular established government." There was sufficient time for this, for the ordinance of secession by the state of South Carolina was passed December 22d, 1860, and the actual commencement of the war, as held in *Perkins* v. *Rogers*, 35 Ind., 124, was August 16th, 1861. See also *Semmes* v. *City Fire Ins. Co.*, 36 Conn., 543. Until the latter date, no prohibition of intercourse was made by our government.

At all events, as we claim, payment of premium was a condition precedent to any liability on the part of the defendants, and a person who claims an advantage from the performance of his act, is not excused by reason of accident, act of God, or of the law, or inevitable necessity, because he might have provided against such by his contract. *School District* v. *Dauchy*, 25 Conn., 530 ; *Moakley* v. *Riggs*, 19 Johns., 69 ; *Dermott* v. *Jones*, 2 Wall., 1 ; *Harmony* v. *Bingham*, 12 N. York, 99 ; *Tompkins* v. *Dudley*, 25 id., 272 ; *Adams* v. *Nichols*, 19 Pick., 275 ; *Oakley* v. *Morton*, 11 N. York, 25 ; *Taylor* v. *Bullen*, 6 Cowen, 624. Judge SWAYNE says, in *Dermott* v. *Jones*, " Unforeseen difficulties, however

great, will not excuse a party from the obligations of his con-
tract;" and adds, " The principle which controlled the decis-
ions of the cases referred to, rests upon a solid sanctity of
contracts. It requires parties to do what they have agreed
to do. If unexpected impediments be in the way, and a loss
must ensue, it leaves the loss where the contract places it.
If parties have made no provision for a dispensation, the law
gives none. It does not allow a contract fairly made to be
annulled ; and it does not permit to be interpolated, what the
parties themselves have not stipulated."

The offer to pay the premiums more than three years after
the policy by its provisions had terminated, clearly could not
operate to revive the policy. *Pritchard* v. *Merchants' Mut.
Life Ins. Co.*, 3 Com. Bench, N. S., 622.

*Third.* The act of Congress of July 13th, 1861, with the
proclamation of the President of August 16th, 1861, which
prohibited all commercial intercourse between the state of
South Carolina and the loyal states, (Laws of U. States, Vol.
12, p. 257 and 1262,) dissolved the contract between the par-
ties to this policy. Indeed the defendants could not have
received the premiums from 1862 to 1865, if they had been
tendered by the insured while residing in South Carolina.
*Bilgerry* v. *Branch,* 19 Gratt., 393. The case of *Want* v.
*Blunt,* 12 East, 183, before cited, is applicable here. Lord
Ellenborough says : " This is in substance a contract to
insure quarterly, and every time the insured elects to pay
a premium at the end of the quarter he elects to enter into a
new contract, because he was under no obligation to pay the
premium, and the other party was under no obligation to pay
the loss unless the premium was paid ; therefore, when he
comes in with his election, and offers the premium, and the
other party accepts it, their minds have met on this new sub-
ject of the insurance for that following quarter, and it is as
much a new and additional contract as it was in its inception."
Clearly then such a contract as would keep this policy in
force could not be made between enemies during the late
war. In the Prize Cases, 2 Black, 687, Judge NELSON says :

" The legal consequences resulting from a state of war be-
tween two countries at this day are well understood, and
will be found described in every approved work on the sub-
ject of international law.   The people of the two countries
become immediately the enemies of each other, all inter-
course, 'commercial' or otherwise, between them unlawful ;
all contracts existing at the commencement of war are sus-
pended and all made during its existence utterly void.   The
insurance of enemy's property, the drawing of bills of ex-
change or purchase on the enemy's country, the remission of
bills or money to it, are illegal and void.   Existing partner-
ships between citizens or subjects of the two countries are
dissolved, and, in fine, interdiction of trade and intercourse,
direct or indirect, is absolute and complete by the mere force
and effect of war itself."   In 5 Wall., 407, the court say,
" Executory contracts with an alien enemy, or even with a
neutral, if they cannot be performed except in the way of
commercial intercourse with the enemy, are *ipso facto* dis-
solved by the declaration of war."   The same doctrine is
held in 6 Wall., 535.   See also the able opinion of Judge
EMMONS, with the authorities cited by him, in the case of
*Tait* v. *N. York Mut. Life Ins. Co.*, before referred to.

That all the principles and rules applicable in cases of war
between different countries are so as respects the different
portions of our country in the late war, is established by
many decisions.   In *Billgerry* v. *Branch*, 19 Gratt., 431, the
court say :—" The decisions of the Supreme Court settle
beyond question that the late conflict between the United
States and the states in rebellion, was a war in the legal
sense, with all the incidents and consequences of a war as
they are known to the international law ; that accordingly
all the citizens on one side were enemies of all citizens on
the other, and that all commercial and other pacific inter-
course or communication between them, unless specially
authorized, was unlawful to the same extent, and for 'the
same reasons, as in a war *inter gentes ;* and that in order to
determine how the contracts of individual citizens were
affected by the late war, recourse must be had to the general

principles applicable to a state of war as they are found in the international code."

See also *Montgomery* v. *U. States*, 15 Wall., 395 ; *Swinnerton* v. *Columbia Ins. Co.*, 37 N. York, 178 ; *Robinson* v. *International Life Assu. Co.*, 42 id., 54 ; *Gray* v. *Sims*, 3 Wash. C. C., 276. In the last case the court says : " If a contract of insurance be legal when it is made, and the performance of it is rendered illegal by a subsequent law, both parties are discharged from its obligations. In such a case the insured loses his indemnity, and the insurer his premium." See also 1 Duer on Marine Ins., 416 to 478 ; *Griswold* v. *Waddington*, 16 Johns., 438. The decisions of courts fully establish this doctrine, as well in regard to all executory contracts, partnerships and agencies, as to marine insurance. Why not to life insurance ? The subject matter of such insurance is life ; in this case the life of an enemy.

The result of the decisions is this : If a contract is entered into between parties who afterwards become alien enemies by the breaking out of war, and the contract is such that its continued existence does not require any intercourse between, or any act of the parties during the war, it is an executed contract, and its obligation is suspended during the existence of the war, and on the return of peace it may be enforced. But if the contract be of such a character that its continued existence and obligation require and depend upon acts to be done by or between the parties during the war, then it is an executory contract, and it is annulled by the war, because there can be no intercourse between the parties, no payment, no transfer of property, no transmission of money, and they can have nothing to do with each other.

*Buck*, contra.

There are two questions which are apparent from the record and which include all others. The first is—Did the rebellion and insurrection lately existing in the Southern States so affect the contract made between the parties in this

suit as to render it void *ipso facto ?*  The second is—Did the
failure on the part of Worthington to pay the premiums in
the years 1862 to 1865 abrogate the contract so that an offer
of payment made within a reasonable time after the close of
the war would not restore it ?  We shall endeavor to show
the court that both of these questions should be answered in
the negative.

*First.*  Did the late war so affect the contract made be-
tween the parties in this suit as to render it void, *ipso facto* ?

There are many authorities defining what contracts are
dissolved and what are suspended by a state of war between
the countries where the contracting parties live.  The princi-
pal ones which are relied upon as authority are the following :
*The William Bagaley,* 5 Wall., 377, 407 ; *Hanger* v. *Abbott,*
6 id., 532, 536 ; *Reid* v. *Hoskins,* 4 Ell. & Blackb., 979 ;
*Esposito* v. *Bowden,* 7 id., 763.  To these may be added the
authority of several cases recently decided, where life policies
have been considered, and which we shall cite in the course
of our argument.

From a consideration of these cases we think the rule to
be drawn from them is fairly stated as follows :  War sus-
pends all contracts between parties living in different coun-
tries hostile to each other, and abrogates them, only—1st,
when the subject matter of the contract relates to that which
may be the subject of belligerent rights; and 2d, when the
contract is purely executory, and requires continuous per-
formance by constant intercommunication across the hostile
lines.  " As a general proposition war suspends the perfor-
mance of ante bellum contracts and denounces as illegal and
invalid those made *pendente bello.*"  *Statham* v. *N. York
Life Ins. Co.,* 45 Miss., 581.  If the subject matter of the
contract be such that by its mere suspension during the con-
tinuance of hostilities neither of the hostile powers could be
affected, then the contract is not dissolved, but is suspended
until the return of peace.  In order to bring the contract
within the rule which calls for its dissolution, it must relate
to that which can be the subject of seizure by the hostile
powers.

Worthington *v.* Charter Oak Life Ins. Co.

This is not a contract of continuous performance within the meaning of the rule.   In order to bring it within the scope of the authorities on that subject, the continuous performance must relate to both parties to the contract.   It cannot be applied to such as require but a single act on the part of one of the contracting parties, and but a single act on the part of the other, repeated at stated intervals.   It will be found that all the authorities on this point relate to cases where each party is constantly engaged in some act to carry out the contract and discharge his duty under it, or where the contract relates to that which can be the subject of confiscation or seizure.   The defendants can perform their duty under this policy by a single act, that is, payment of the sum of $1,000 on proof of death.   Viewed from their stand-point it is the performance by a single act of a continuing contract; not a continuing performance, but a continuing contract.

Nor was any continuous act necessarily required on the part of Worthington when the war broke out.   The contract had been executed so far as he was concerned until January, 14th, 1862.   He had but one thing to do when he entered into the contract, and that was to pay the premiums.   If the premiums had all been paid at once and in one sum, then it could not be pretended that the contract was continuous, and yet contracts of this character are mentioned in the authorities on insurance.

When we consider the reason of the rule which is said to prevail with respect to contracts dissolved by war, it is difficult to conceive how any distinction can be drawn between paying the premiums at once, and at stated intervals with no continuous acts between.   That it would aid the enemy for Worthington. to remit the premium across the hostile lines, may be said to be the reason in the present case.   If this be so, then all the objects sought to be attained by abrogating the policy, are gained by a suspension of that duty on the part of Worthington, until the war ended.   Would it not equally aid the enemy if the amount of a promissory note should be paid in a similar way?   But all the authorities

agree that in the latter case the contract is not abrogated. It is only suspended during hostilities.

This claim is well stated by the counsel in the case of *Hamilton* v. *Mutual Life Ins. Co.*, 9 Blatchf., 234, and afterwards sustained by the court. He says : " The principle of abrogation by reason of continuous performance cannot, therefore, be applied to such contracts as a class ; and the alternative is to suspend performance in the particular instances where communication may be needed. Viewed in this light the contract is closely analogous to one of purchase, when sundry installments of the purchase money have already been paid, and others are to be paid in the future. Any such discrimination would lead to the most absurd consequences. Two contracts between the same parties for the purchase and sale of adjoining parcels of land, containing provisions for the payment of an installment of the purchase money at future, but not coincident dates, would, upon such a principal remain valid, but suspended during war ; while a single contract between the same parties, to the same effect, would be absolutely destroyed." In the case of *N. York Life Ins. Co.* v. *Clopton*, 7 Bush, 179, a case similar to the one under discussion, the court says : " The reason for dissolution seems to be inapplicable to contracts which may be performed by a single act or periodical acts, between which there is nothing to perform, and consequently no continuity of performance. *Between a single act and such periodical acts there is no apparent difference in reason or principle.* Therefore the law which only suspends the remedy in one case, cannot consistently dissolve the contract in the other." Judge BLATCHFORD, in the case of *Hamilton* v. *Mutual Life Ins. Co.*, above referred to, says : " The case is one where a suspension of performance on the part of the assured will effectuate, as respects the belligerent government, the whole aim of the law, without dissolving the contract. As regards the obligation of the insurer the contract was not one at all of continuous performance, although it was a continuing contract."

This contract was partly executory and partly executed,

and the authorities which may be cited to show that it should be abrogated by the war will all be found to relate to another class of contracts. Those harsh rules laid down for our guidance by those who oppose the claim of the plaintiff, are inapplicable to a case where, by a partial execution, vested rights have been acquired. We have parted with our money from time to time, while the defendants have parted with nothing. Worthington acquired a right in the policy which nothing but his own act could destroy. The war could not abrogate this vested right. It was a debt due him, and if the company had closed its business when the war broke out, he would have been entitled to the surrender value of his policy.

If the defendants had kept an agent at Greenville during the war, the contract would not have been abrogated, as payment could have been made or tendered within the confederate lines, which would have been lawful. *Ward* v. *Smith*, 7 Wall., 452 ; *Clark* v. *Morey*, 10 Johns., 73 ; *Conn* v. *Penn*, 1 Peters C. C., 496 ; *Deniston* v. *Imbrie*, 3 Wash. C. C., 396 ; *Buchanan* v. *Curry*, 19 Johns., 137 ; *Kershaw* v. *Kelsey*, 100 Mass., 561. It will be remembered that the premiums were paid by Worthington, at first, to an agent of the defendants at Greenville, and that after withdrawing their agent the defendants promised to give notice when the premiums became due, which they never did after the payment of January 14th, 1861.

It has also been urged as a reason why contracts of life insurance should be dissolved, that to maintain and keep alive contracts of such a character would give aid and comfort to the enemy. We have already shown how no aid or comfort could be given to the enemy by a suspension of a contract, so far as the insured was concerned. It is difficult to see how a policy on the life of a non-combatant could give aid and comfort to the enemy, if kept alive during the war. The reason why contracts of life insurance should not be abrogated, is well stated by the counsel for the plaintiff in the case of *Hamilton* v. *Mut. Life Ins. Co.*, above referred to. " The contract of insurance is not *per se* such a contract that

war afterwards occurring between the governments of the contracting parties, absolutely of itself dissolves it. When it deals with property which may be affected by, or is the subject of belligerent rights, it must yield to the exercise of those rights; when it deals with property which is not connected with those rights, subsequent war should be deemed to act upon the remedy, and not upon the contract."

Worthington was a non-combatant. The declaration says that "the said Worthington did not in any way participate or engage in said rebellion and insurrection against the United States." Now if he was in no way connected with the rebellion, he must have remained a loyal citizen of the United States. If this be so, could his life be the subject of belligerent power? Could the hostile government seize upon and confiscate it? Would it give any aid and comfort to the enemy not to destroy the life of a non-combatant living within his lines? It is when the policy applies to property that the rule requiring abrogation should be applied. In the case of marine insurance the contract applies to property which may be the subject of confiscation. A contract of life insurance is wholly different. The former is a contract of indemnity, the latter an agreement to pay a certain sum of money upon the happening of an event which is sure to happen. The former restores the thing insured, the latter restores nothing. There is nothing therefore in the life of a non-combatant which can be the subject of belligerent rights. Insurance therefore upon such a life could give no aid or comfort to either of the hostile powers.

In the case of *Tait* v. *N. York Life Ins. Co.*, (Circuit Court of Western District of Tennessee,) Judge EMMONS holds that, by keeping a similar policy alive, aid and comfort might be given the enemy, for the reason that in the event of death during the war, a debt would be created in favor of a citizen within the confederate lines which might be taken. But it is difficult to see how such a debt could give aid and comfort to a government that could collect it only by pushing its military lines far enough to include the property of the insurer. And when we consider that a debt represented by a promis-

Worthington v. Charter Oak Life Ins. Co.

ory note executed before the war cannot be the subject of confiscation, it is still more difficult to see the force of the learned judge's argument.

The case of *Furtado* v. *Rodgers*, 3 Bos. & Pul., 191, was a case of marine insurance, where an insurance was effected in Great Britain on a French ship previous to the commencement of hostilities between those nations. The court held that the contract was not good as against capture by the British government, but that "the contract was legal at the time the risk commenced, and was a good insurance against all other losses."

Judge BLATCHFORD, in the case of *Hamilton* v. *Mut. Life Ins. Co.*, (before cited,) upon this point says : " The principle on which the rule (of abrogating contracts) rests, does not extend to avoiding policies insuring property which is exempted by the laws of war from liability to be seized by the government of the insurer's country. While the rule would avoid a policy insuring the life of one who should become an actual and active enemy of such government, it thus acquiring the right to destroy his life, it would not affect the validity of an insurance on the life of a neutral, passive, non-combatant enemy, who remained such in fact, and over whose life there is no belligerent power on the part of the government of the insurer. Though by his domicil he is a technical enemy, so that his property may be lawfully captured as enemy's property, yet as such nominal hostility does not subject his life, like his property, to peril, no belligerent right is affected by continuing the validity of the insurance. Nor is it perceived how the amount or value of a policy on the life of an alien enemy who dies during the war can be availed of to aid the war by the government of the country of the assured, in any way or to any extent, in or to which the amount or value of a promissory note made before the war, and falling due during the war, cannot be availed of to aid the war by the government of the country of the holder, while its maker continues to be an alien enemy." The same doctrine is maintained in the case of *N. York Life Ins. Co.* v. *Clopton,* 7 Bush, 179, (Court of Appeals of Kentucky,) where in a

case similar to this the court sustains the policy against the company, and upon the point now under discussion says: " Neither authority nor principle would avoid the policy, any more than if it had insured the life of a child in the cradle, or insured property exempt from capture or confiscation." See also, *Ex parte Boussmaker*, 13 Ves., 71 ; *Buchanan* v. *Curry*, 19 Johns., 137. We conclude therefore that there is nothing in a contract of life insurance which calls for its dissolution at the breaking out of a war, by reason of its tendency to give aid and comfort to an enemy.

The proclamation of the President forbidding intercourse was dated Aug. 16th, 1861. Such contracts therefore as would be abrogated by the war itself, must be held to have been abrogated on that day. Worthington had paid his premium on the 14th of January preceding ; he had no other duty to perform until January 14th, 1862, if he should live. Suppose that he had died after August 16th, 1861, and before January 14th, 1862 ? No claim of continuous intercourse could then have been set up as a reason for abrogating the policy. No intercourse was required. We should then see a contract wholly executed on one side before the war commenced, requiring no intercourse whatever, and requiring but a single act—that is, payment of the amount named in the policy—on the part of the other party beyond the hostile lines. It would be simply a debt contracted before the war, and owed by a party on one side of the military line to a party living on the other, the payment of which would be forbidden by the laws of war during hostilities. Or suppose that Worthington had been insured on what is known as the ten year plan, and the last payment necessary to be made by the terms of the policy had been made January 14th, 1861 ; could the contract then be said to be of continuous performance requiring intercourse ? The war might have commenced after the last payment had been made and continued as long as the war of the Revolution, while not the slightest act would have been necessary on the part of either party to keep the policy alive. We should then have a contract entirely executed on one side, and requiring but a single act on the other.

Nothing could be more unjust than to relieve a corporation from its obligation under such circumstances. The authorities claiming that contracts of life insurance are abrogated by the war are compelled to take this unfortunate attitude. Judge EMMONS, in *Tait* v. *N. Y. Life Ins. Co.*, says that " the contract became unlawful and was discharged the moment they became public enemies." Such a claim would abrogate a policy the premiums on which had been paid before the war began, and were not due *by the terms of the contract* until after the return of peace. If our war had not exceeded in point of duration the late Franco-Prussian war, it would have begun and ended between January 14th, 1861, and January 14th, 1862. How then could it be said, in such a case, that the contract required intercourse with the enemy to keep it alive ? or that it was a contract of continuous performance ? It could hardly be said that the contract was even suspended, and yet the authority above cited, and all others in aid, are compelled by the force of their own reasoning to say that a war lasting no longer than ninety days, the period predicted for the late war to last, would abrogate all life insurance policies similar to the one on which this suit is brought.

The following are the principal decisions which have been relied on by those who favor the doctrine that war of itself abrogates contracts similar to the one on which this suit is brought. *Furtado* v. *Rodgers*, 3 Bos. & Pul., 191 ; *Potts* v. *Bell*, 8 T. R., 548 ; *Kellner* v. *Le Mesurier*, 4 East, 396 ; *Gamba* v. *Le Mesurier*, id., 407; *Brandon* v. *Curling*, id., 410; *The Hoof*, 1 C. Rob., 165 ; *Esposito* v. *Bowden*, 7 El. & Blackb., 763 ; *Avery* v. *Bowden*, 6 id., 953. These are all cases which relate either to marine insurance or to contracts requiring continuous performance. *The doctrine of abrogation of contracts by war has never been applied to cases of life insurance.* Every nation is justified by the laws of war in destroying the *property* belonging to its adversary, but no Christian nation pollutes its name by destroying *life*, unless it belongs to one in arms against its authority.

The following cases recently decided, all sustain the claim

that war does not of itself abrogate a contract of life insurance. *N. York Life Ins. Co.* v. *Clopton*, 7 Bush, 179; *Statham* v. *N. York Life Ins. Co.*, 45 Miss., 581; *Hamilton* v. *Mut. Life Ins. Co.*, 9 Blatchf., 234; *Cohen* v. *N. York Mut. Life Ins. Co.*, 50 N. York, 610; *Sands* v. *N. York Life Ins. Co.*, id., 626; *Martine* v. *International Life Ins. Co.*, 53 id., 339; *Hillyard* v. *Mut. Benefit Life Ins. Co.*, 35 N. Jersey, 415; *Manhattan Life Ins. Co.* v. *Warwick*, 20 Gratt., 614.

The decisions relied upon by our opponents were made when life insurance was but little known. No life policy had ever been considered with reference to the effect of war upon it. The vested rights of the insured, the injustice of relieving one party from his obligations while the other had discharged a part of his, the manifest wrong in requiring a party to perform an act which by law he was for a time forbidden to do, all these questions have but just appeared in our courts. In deciding them the court will not be influenced by decisions made in another age, and relating to a subject matter wholly unlike that to which the present suit relates.

*Second.* Did the failure to pay the premiums in the years 1862, 1863, 1864 and 1865, abrogate the contract, so that an offer of payment made within a reasonable time after the close of the war would not restore it?

We have shown how the war did not of itself avoid this contract; we shall now endeavor to show that the existence of the war was an excuse for not paying the premium.

As we have before stated, a contract of life insurance is essentially different from the contract contained in any other kind of insurance. The contract for fire insurance is for a certain time, and while the amount may not be above a certain sum named, yet it may be less. The time is definite, the amount indefinite. In the life policy the time when the amount will become due is uncertain and indefinite, the amount definite. Fire and marine insurance indemnifies for actual loss, not exceeding a certain sum in dollars and cents. Life insurance is not a contract of indemnity, as human life has no value which can be estimated in dollars and cents. When therefore the policy is signed by the company and the

premium paid, it becomes an entire contract between the insurer and the insured *during the life of the latter*, provided he pays the annual premium. It is an entire contract, to become void only by the failure to perform conditions subsequent. If the contract was intended to be for but one year, it would be easy to so write the policy. The language of the policy is, "In consideration of the sum of twenty-seven dollars and sixty cents to them in hand paid,    *    *    * and of the annual premium of twenty-seven dollars and sixty cents to be paid on or before the 14th day of January in every year during the continuance of this policy, do assure the life of Lewis Worthington *for the term of his natural life*." As it is impossible to determine the length of a man's natural life, it is therefore impossible to determine the *duration of the risk* in a policy of life insurance. Yet this is an essential element in every other kind of insurance. We conclude, therefore, that a contract of life insurance is a contract where the length of time for which the risk is taken cannot be known. We say, therefore, that on the 14th of January, 1862, the contract under discussion was complete for the natural life of Worthington, if he performed the conditions subsequent—that is, paid the premium. No new contract was necessary. His contract was already made; he was familiar with its terms; he had nothing to do but pay his premium.

The case of *Manhattan Life Ins. Co.* v. *Warwick*, 20 Grattan, 614, was a suit brought on a life policy of $10,000, which contained a provision of forfeiture in case of non-payment of the premium when due. The last payment was made at Richmond, Virginia, July 23d, 1861. The premium falling due July 23d, 1862, was tendered to the agent of the company but was refused. The insured died in November, 1862. The court says :—"The policy is one entire contract, not from year to year as premiums shall be paid, but for the whole term of the life of the insured, upon condition that if the annual premium is not paid on the 23d of July, the policy shall cease and be void. It is not a contract of indemnity on a policy against fire for a definite period, but

it is a contract to pay a certain sum of money, for the consideration mentioned, upon the happening of an event which is inevitable, and only uncertain as to the time it may transpire."

If he had no legal excuse for non-payment, then he must forfeit his rights under the policy. We say that the war excused him from such payment. He was forbidden to do so by the President's proclamation of August 16th, 1861, based on the act of Congress of July 13th, 1861. This had all the force which the military power of the government could give it. It was impossible for him to make the payment without violating this law. He was prohibited by the common laws of war from making the payment. By the same law which forbids the act, a forfeiture is claimed for not performing the act. The law of nations forbids the payment. The law of nations punishes for its non-payment. This is the position that must be taken by those who insist that war does not excuse the non-payment of premiums.

The act of God and the law will excuse the non-performance of a contract. Authorities sustaining this position are ample. The following are some of the leading ones: *People* v. *Tubbs*, 37 N. York, 587; *Touting* v. *Hubbard*, 3 Bos. & Pul., 291; *Semmes* v. *City Fire Ins. Co.*, 13 Wall., 162; *Jones* v. *Judd*, 4 Comst., 412; *U. States* v. *Thomas*, 15 Wall., 337; *Davis* v. *Gray*, 16 id., 203; *Worth* v. *Edmonds*, 52 Barb., 40.

In the case of *Semmes* v. *City Fire Ins. Co.*, 13 Wall., 162, an action on a policy of fire insurance, with a condition that suit must be brought within twelve months after the loss had occurred, the court say:—"We have no doubt that the disability to sue, imposed on the plaintiff by the war, relieves him from the consequences of failing to bring suit within twelve months after the loss, because it (the war) rendered a compliance with that condition impossible." The case of *United States* v. *Thomas*, 15 Wall., 351, is another case in point. This was an action on the official bond given by the surveyor of the customs for the port of Nashville. The rebel authorities had forcibly taken the public moneys in the

hands of the surveyor, and which belonged to the United States. Suit having been brought on the official bond by the attorney-general, the court held that the defendant was excused from the performance of the condition of the bond, because he was prevented from performing it by an overruling necessity, and said that "no rule of public policy requires an officer to account for moneys which have been destroyed by an overruling necessity, or taken from him by a public enemy, without any fault or neglect on his part." Lord Coke says, "In all cases where a condition of a bond, recognizance, &c., is possible at the time of making the condition, and before the same can be performed the condition becomes impossible by the act of God, or of the law, or of the obligee, then the obligation is saved." Coke Litt., 206 a. In *Hilliard* v. *Mutual Benefit Life Ins. Co.*, 35 N. Jersey, 418, Chief Justice BEASLEY, in a case similar to the present suit, says, "The exact performance of the contract on the part of the assured has been rendered impossible by the act of the law, and as such occurrence was not a contingency which can reasonably be supposed to have been within the contemplation of the contracting parties at the time they bargained, I think this failure in a strict compliance is not a legal breach of the agreement. The reasonable and true doctrine seems to be, that express terms are necessary to create an obligation which will include a liability in case of an unanticipated prevention by the act of God, or of the law, of a fulfillment of a stipulation." To this able opinion may be added the opinion of the courts in the cases cited to sustain the position that the war did not of itself abrogate the contract.

The authorities we have cited as sustaining our position are of the highest character. The cases seem to have been well considered, and the courts which have rendered these decisions seem to have arrived at their conclusions after the most careful and patient investigation. But a single authority of weight has appeared holding a contrary opinion, that of Judge EMMONS in the case of *Tait* v. *N. York Life Ins. Co.*, before cited. It is true that in the case of

*Dillard* v. *Manhattan Life Ins. Co.*, 44 Georgia, 119, the court say that such a condition (of non-payment) is a condition precedent, not a condition subsequent.   But as this bare statement is unaccompanied by any reasons for such a conclusion, it may be said to add to the number, but not to the weight, of authorities against us.   Judge EMMONS, in a long argument, holds that a life policy was abrogated by the late war, where the insured was a resident of Tennessee and the insurers were located in New York.   The decisions made by the English courts, which he quotes to sustain his position, were made at a time when life insurance was unknown, and the policies there construed were policies on *property*, not upon *life*.   All the courts of last resort which have passed upon this question since the war, have given opinions against this decision, with the exception of the case in Georgia above cited.   The case of *Sands* v. *N. York Life Ins. Co.*, which Judge EMMONS quotes as sustaining him, was overruled by the Court of Appeals of New York, and a decision rendered in accordance with the claims of the plaintiff in the present case.   *Cohen* v. *N. York Life Ins. Co.*, is also a case cited as sustaining the views of Judge EMMONS.   This case was afterwards decided the other way by the Court of Appeals.

The system of making all policies non-forfeiting under all circumstances, is rapidly taking the place of the old method. The legislatures of several states have placed laws upon their statute books calculated to make all policies non-forfeiting, thus showing that the policy of the states is against any kind of forfeiture in the case of life policies.   The decisions of modern times have greatly modified the harsh rules of ancient warfare.   A disposition to protect private property and private rights to the fullest extent, except where they interfere with military success, is the doctrine of nearly all the more recent cases.   In conclusion we say, that the war did not of itself abrogate the policy, and that the non-payment of premiums at the time they were due was excused by the war; and that after the insured made a tender of the back premiums, and they had been refused, his rights under the policy were complete, and remained so until his death.

CARPENTER, J. This is an action on a policy of life insurance. The declaration sets out the policy, alleges the payment of the annual premium up to January 14th, 1862, the non-payment and an excuse for non-payment for that and the succeeding years, the death of the insured, proofs of death, and a refusal to pay. To the declaration there is a demurrer. The sufficiency of the declaration depends upon the legal effect of the non-payment of the premiums, considered with reference to the facts alleged as an excuse.

A contract of life insurance is a peculiar contract. It has no parallel and few analogies in all the business transactions of life. An ordinary life policy, like the one in suit, requiring the payment of annual premiums, consists of two parts, and is divisible. The applicant, upon the payment of the first premium, effects an insurance upon his life for one year, and purchases a right to continue that insurance from year to year, during life, at the same rate. Whether he will continue it or not is optional with him. The premium for the first year pays for the risk during that year, and for the right to subsequent insurance. The rate of insurance for a single year is less than the annual premiums on a life policy. The difference, continued, as it is supposed it will be, from year to year through life, may be regarded as the consideration for the right to continue the insurance.

As the time for which the party was insured by the actual payment of premiums had expired before his death, the case turns entirely upon the second part of the contract. In respect to that, what relation did the contracting parties sustain to each other? The defendants, for a valuable consideration, made an irrevocable proposition to insure the applicant during life, upon certain terms and conditions. He was at liberty to accept or reject the proposition. If he accepted, he was to comply with the condition and pay the premium on or before a given day. If he neglected to pay within the time limited, according to the letter of the contract, he virtually rejected the proposition, and the contract was at an end.

In terms, the contract is a very simple one. The defend-

ants, in effect, say to the other party, " Pay at the time stipulated and you are insured ; omit such payment and our proposition is withdrawn, and your right to insure is extinguished." It is impossible to put any other construction upon it.   There is no room for doubt or uncertainty.   The payment required is in no sense conditional.   The proposition is not, pay if convenient ; pay unless sudden sickness prevents ; pay unless some unexpected turn of fortune deprives you of the means of paying ; pay unless the act of God or the law intervenes to prevent payment; but absolute payment is required.   To make it still clearer, the proposition is not, if poverty, sickness, accident, or the law prevents payment, you shall be insured the same as if you had paid.   None of these risks were taken by the defendants ; they were all taken by the insured.   Every word of the instrument, embodying the agreement of the parties, is consistent with this view of the contract, and the whole instrument, when fairly considered, is inconsistent with any other view of it.   It would seem that this analysis of the contract would of itself be a sufficient answer to the plaintiff's claim.

But courts of high standing, both of our sister states and of the United States, have viewed these contracts differently, and have come to a different result.   They vary somewhat, however, in the reasons for their conclusions.

The case of *Hilliard* v. *New Jersey Mutual Benefit Life Insurance Company*, 35 N. J., 415, interpolates in the contract a provision, that if the law rendered the payment of the premiums impossible at the time, the insured was excused from paying, and might save the insurance by paying it subsequently.

In *Hamilton* v. *Mutual Life Insurance Company*, 9 Blatchford, 234, one reason given, among others, is, that the contract imported an agreement by the company to keep an agent in the state where the insured resided— one of the seceding states—during the war ; and that the withdrawal of that agency was a wrongful act, which excused the insured from paying and saved the insurance.

In the case of *Manhattan Life Insurance Company* v. *War-*

*wick*, 20 Gratt., 614, importance is attached to the local law of Virginia, which, as is held, required the company to keep an agent in that state during the war, to whom premiums could be paid, and that payment to him in one instance, although not strictly in the mode prescribed in the contract, and in another instance a tender of payment during the war, and after the authority of the agent had been, in form at least, revoked, operated to keep the policy alive.

In the case of *Clopton* v. *The New York Life Insurance Company*, 7 Bush, 179, stress is laid upon the hardship of the case if the forfeiture is enforced.

We do not attempt to give all the points considered, nor even the substance of the argument; for in all the cases the whole question is elaborately discussed. Other points, however, and some of the arguments will be more fully noticed as we proceed. A due regard to these various decisions, and others of like import, requires us to examine with care the law bearing upon this case.

1. It will be seen from what has already been said, that we regard the payment of the premiums as a condition precedent to any subsequent liability on the part of the defendants. If this had been an absolute contract by the insured to pay a sum of money by a given time, neither accident, inevitable necessity, nor the act of God, would excuse a non-performance. But if payment was unlawful, that would be an excuse. *School District* v. *Dauchy*, 25 Conn., 530. But that doctrine has no application to a case where it is at the option of the party to do or not to do the thing contemplated. He has a perfect right to do it or not to do it. He needs no excuse, whatever his action may be. The question is, if he omits to perform, from any cause whatever, does he thereby obligate the other party precisely as he would if he had performed? The answer to this question must be found in the contract itself. By a reference to it, it will be seen that there is nothing in it which gives, the slightest indication that such was the intention of the parties, and there is no legal ground on which we can interpolate in the contract such a provision. We venture to say that no precedent can be

found for such action by a court of justice, prior to some of the recent decisions upon this subject. If any such exist they have escaped our notice. We can not, therefore, accept as sound the doctrine that the existence of the war, making it illegal to pay the premiums, saved the rights of the party and kept the policy in force.

2. The ground taken, that the late civil war was such an extraordinary event, and so entirely unlooked for, that it will be presumed that it was not contemplated by the parties, and therefore the law will imply a qualification of the conditions in case of war, is hardly tenable. In the first place, the policy itself provides that the insured shall not, without the previous consent of the company, " enter into any military or naval service whatsoever, the militia not in actual service excepted." So that, in this case, war was in the minds of the parties, and therefore there would seem to be no room for the supposed presumption. On the contrary, the fact that war is clearly referred to, shows that the parties contemplated a state of war as possible ; and the fact that the qualification contended for is not inserted, affords some ground for presuming that the parties did not intend such a qualification.

But aside from this,—assuming that the possibility of a war between the sections was not contemplated by the parties,—is it clear that the law will imply the modification of the contract contended for ? In the case of written contracts, the law will imply nothing except what may fairly be presumed to have been intended by the parties. Hence, if an unlawful act is embraced in general words used in a contract, the law will presume that the parties did not intend it, and will imply an exception. A case in one of the English reports affords an illustration. A contract of marine insurance insured against capture. The vessel was captured by the government of the insurer. It was held that the capture, although within the letter of the contract, was not within its true meaning, on the ground that an express contract insuring against such capture would be void as against the policy of the government, and therefore the law presumed that the parties intended that such a capture should be excepted.

But what reason is there for presuming an exception in the present case ? It cannot be presumed from the mere fact that the act to be done, which was lawful when the contract was entered into, had unexpectedly become unlawful. That may have been a good reason why the insured, in exercising his right of election, should elect not to pay the premiums ; but it certainly affords no ground for presuming that the parties intended in such a case that he should have all the advantages of an actual payment.

The business of life insurance has grown to immense proportions in the last fifty years. During that time it has engaged the attention of many of the best minds in this country and in Europe. It has been studied from every possible stand-point, and considered with reference to every possible vicissitude in human affairs, including a state of war as well as peace. Every element that enters into the chances of human life, and that affects the risk assumed, has been well considered and re-considered, and the policies of all well regulated companies have been prepared with great care, with a view to express clearly the precise intention of the parties, and to guard the rights of all concerned. With all the light that experience and thought have thrown on this subject, it never has occurred to any one connected with the business, so far as we know or believe, that a clause of this kind was needed to protect the rights of any one. On the contrary, we venture to assert that a life insurance policy containing a provision that in case of war between the government of the insured and the government of the insurer, the policy should be continued in force during the war, without the payment of the premiums, would be unprecedented in the history of life insurance ; and if a court of justice construe the contract as meaning that, they impute to the parties a meaning which they did not intend ; for it cannot be presumed that any company, managed by intelligent men, would knowingly and understandingly make such a contract.

3. In two of the cases referred to, the decision rests in part upon an interpretation of the contract, which injects into it a provision binding the company always to keep an

agent in the state in which the insured resided, with authority to receive the annual premiums, and that the withdrawal of the agency was a breach of the contract by the company, which estopped the company from setting up the non-payment of the premiums as a defense. It is not pretended that the policy itself contains any language that will bear such a construction; but the obligation is inferred, partly from the circumstances under which the contract was entered into, and partly from the law of the state in which the contract was made, requiring all foreign companies doing business in the state to keep an agent there to file certain sworn statements in public offices, &c., and accept service of process against the company.

So far as the present case is concerned, we might dismiss this point with a simple allusion to the fact that the law of South Carolina is not made a part of this case ; and that so far as the inference is one of fact it hardly falls within the province of this court. But we choose not to rest our decision upon any narrow or technical ground.

We shall, therefore, assume that the laws of South Carolina in this respect are substantially like the laws of Alabama and Virginia, and treat it simply as a question as to the proper construction of a written instrument, taking into consideration the local law and the circumstances attending the case. The obligation inferred is hardly a proper subject of legal inference. Whether the premiums should be paid in South Carolina or Connecticut, was a matter of indifference to the law. To justify a court of justice in drawing such an inference, the circumstances should be very strong. In this case they seem to be rather weak. The fact that the contract was made with, and the premiums paid to, an agent of the company in South Carolina, coupled with the fact that the insured, with the knowledge and consent of the company, always resided there, affords very slight grounds for presuming that the parties contracted that the defendants should always, and under all circumstances, during the life of the policy, keep an agent there for that purpose. On the other hand, the fact that the parties contracted expressly in refer-

ence to the time of payment, and the receipt to be given therefor, and were silent in respect to the place of payment, affords some presumption that they intended to leave that matter to be regulated by their mutual convenience.  To us, the latter presumption seems much stronger than the former.

The principal if not the only provision in the statute which bears upon the question, is that which requires a sworn statement of the gross premiums received for insurance by the company at the agency during the preceding year to be annually deposited with the assessor.  This was undoubtedly for the purposes of taxation, and is some indication that the legislature intended that the premiums paid by citizens of the state should be paid through the agency, that they might be reached for that purpose.  If the legislature intended this it is a little surprising that they did not express that intention in plain language, instead of leaving it to be implied from language which may, with equal propriety, bear another construction, and be operative without resorting to the implication.  This and other requirements of the statute were only operative in case the defendants chose to transact business in the state, and only so long as they continued to do so.  There is nothing which, even by implication, requires them to begin business, and there is not enough to justify the inference that they intended to compel the continuance of business when once begun.  Taking the statute and the circumstances together, the interpolation of such a provision in the policy seems more like the creation than the construction of a contract.

But let us test this interpretation by its fruits.  The agency is continued during the war that the policy-holder may there pay his premiums from year to year.  The moment the agent receives it, it is subject to the confiscation act, and immediately finds its way into the confederate treasury.  This is conceded ; and the learned judge in *Hamilton* v. *Mutual Life Insurance Company of New York*, attempts to evade the force of it by suggesting, on page 256, that the insured " could have tendered the premium, and the agent could have

refused to receive it because he could not remit it and be-
cause it would be confiscated." In that event, we apprehend
that a shrewd and sagacious government would not have
been long in discovering that the insured held funds belong-
ing to a northern institution; and vigilant collectors would
soon have destroyed all hope that he could keep them for the
benefit of the creditor until after the termination of the war.
If the confederate government had determined to devise a
plan by which they could draw funds from the loyal people
of the North to aid in carrying on the rebellion, they could
hardly have devised a more ingenious or more successful one
than this. The success and magnitude of such a scheme
will be apparent when we consider that probably every life
insurance company in the country had agencies in the seced-
ing states; and that the number of policy-holders was so
large as to justify the belief that the flow of money through
this channel into the treasury of the confederacy would have
been constant and unremitting. And then, to trace the
results still further, after the termination of the war, and
the policy-holders have paid to the rebel government the
premiums for four successive years, suits are brought on the
policies, and courts of justice are gravely asked to hold the
companies liable, and that too without any abatement on
account of the premiums which the companies did not receive.
Such are some of the consequences to which this argument
inevitably leads.

But again; let us briefly consider the effect of the war
upon such a contract as is here contemplated. It is now
supposed to be a contract containing mutual obligations.
The defendants undertook to keep an agency in South Caro-
lina, and the insured, if he would continue his policy, under-
took to pay his premiums at such agency. It must be re-
membered that the obligation to keep an agency is inferred
partly from the previous course of business, and if it exists
at all it obliges them to continue the agency during the war
substantially as before. It must also be borne in mind that
it is not a rule for an isolated case, but it is applicable to all
life insurance companies, and all their agents, and to every

policy in the seceding states. In theory, and before the war such it was in fact, the business of the agency is to negotiate and secure new policies and receive premiums as they become due on outstanding policies. The agents are required to report their proceedings and make remittances at short intervals to their northern principals and receive instructions from them. Practically the whole business of the agency is interrupted and destroyed, and the agent is reduced to a mere figure-head without duties or powers, to whom each policy-holder may annually go through with the form of tendering his premium. Every possible advantage to the company from the agency is destroyed, and the agency, which is judicially required, is radically and essentially different from anything which either party ever contemplated. Is that just? Is it not much more reasonable to hold, and does it require any argument to show, that such a contract is entirely abrogated by the war? Every argument and every reason that can be urged for the abolition of a contract of partnership or of affreightment applies equally well to such a contract as this. It becomes a contract of continuing performance in the strictest sense

4. But it is said that the non-performance of a contract will always be excused when the intervention of the law forbids one party from performing and the other party from receiving performance. This is doubtless a sound proposition. But the difficulty is, it does not aid the plaintiff. The real question is, not whether the party is excused from performing, but what are the consequences of not performing? In one of the cases the court says: "Their" (the defendants) "inability to receive the premium when due amounted to the same thing as if the premiums had been actually tendered and the defendants had refused to receive them." With all deference we submit that this cannot be true as a general rule. No case occurs to us in which it would be true when applied to an unconditional contract. To illustrate: a man contracts to erect for another a wooden building at a given place on or before a given day. Before performance the act becomes unlawful, by city ordinance, for

example, forbidding the erection of wooden buildings in that locality. Non-performance would certainly be excused, but his legal excuse would give him no right under the contract. No action could be maintained against him for not erecting the building, and it is equally true that he could maintain no action against the proprietor for the price agreed to be paid, nor for damages for not permitting the erection of the proposed building. The law having annulled the contract, both parties are absolved from all obligation under it. Therefore it is not true that the parties would stand as they would if performance had been lawful, and there had been a tender of performance and a refusal. Neither is the proposition a sound one in its application to the case under consideration. Let us lay aside the existing insurance, and consider the contract solely in reference to the future. The defendants say to the insured, " Pay us so much money on or before a given day, and we will insure your life a given sum for one year from that day." The defendants' undertaking is a conditional one. If the other party does not pay no obligation attaches. Before payment, and on the day named, the law absolutely prohibits the one party from paying, and the other party from receiving pay. It cannot be true that that would be equivalent to payment ; or, assuming that there is no legal impediment, a tender of payment and a refusal. If it is, then the law excuses one party from paying the consideration, and yet gives him the benefit of the contract precisely as if he had paid. It deprives the other party of the consideration, and converts a conditional promise into an absolute one without performance of the condition.

It is no answer to say that the premium may be subsequently paid or allowed when the policy is collected. The parties have a right to make their own contracts, and courts have no power to vary them or make contracts for them. They have fixed the time of payment and made it material. *Time is of the essence of the contract.* The law will no more postpone the payment in such cases than it will deprive the party of it entirely. In this as in unconditional contracts,

the law having intervened to prevent performance, there is no contract and no liability attaches to either party.

The only possible answer to this view of the case that we can conceive of, is, that the insured had a vested interest in subsequent insurance in consideration of the premiums paid for the preceding years, of which the law will not deprive him. If the law is driven to the alternative—either to destroy that right or vary the contract, or rather make a new one for the parties,—we submit that the former is less objectionable than the latter. For the latter we have no precedent, and there is no limit to the mischief which will follow the introduction of such a principle into our system of jurisprudence. In respect to the former, it is neither the first nor the only instance in which war destroys private rights and vested interests. But no such alternative exists. It is not strictly correct to say that the law deprives the insured of a vested right. The law simply enforces, according to its letter and spirit, the contract which the party made. If that works a forfeiture, the hardship is attributable to the contract and not to the law. Neither the defendants nor the law guaranteed that performance by the insured should always be lawful.

Thus far in considering this point we have assumed that the law directly prohibited the payment of this premium. But such is not the fact. Payment in itself considered was not unlawful. The law simply prohibited intercourse between enemies. As a consequence payment which required such intercourse was prohibited. If payment could be made without such intercourse it was perfectly lawful. Such payment was certainly possible. Had the insured come into the northern states and remained here, or employed an agent, as he had an opportunity to do, (for war, as a coming event, cast its gloomy shadow before, especially in South Carolina,) he, or his agent, might have paid, and the defendants might have received, the premiums without the violation of any law whatever. We cannot, therefore, attribute to the law consequences which the party, by his own act, has brought upon himself.

5. In *Clopton* v. *New York Life Insurance Company*, 7 Bush, 179, the court attaches importance to the supposed hardship of a forfeiture. It says: " However lawful the conditions of avoidance, as prescribed in this case, may be admitted to be, it is in effect a forfeiture, which ought not to be favored. To subject to forfeiture all the premiums paid, as well as the five thousand dollars for the loss of life, would be harshly and unreasonably penal for no better cause than the inevitable non-precise payment of another installment of premiums, which the law prevented the appellant from a right to receive. None of the parties can be presumed to have contemplated such disabling war, or to have intended, by the condition of avoidance, more than voluntary failure to pay when there was legal ability to receive the premiums."

The rule of law that forfeitures are not favored is a salutary rule, and we have no disposition to weaken its force. We should be careful, however, to guard against its misapplication. In respect to contracts, it is usually, if not universally, applied to cases in which the party, by doing or omitting to do some act, forfeits an estate or a sum of money, *in addition to losing the advantages of the contract.* This is the first instance within our knowledge in which it has been applied to give the party the benefit of the contract without performance on his part. We contend that this is not such a forfeiture as calls for or admits of the application of the rule. One man cannot forfeit the property of another. The thing forfeited must be his own. The argument assumes that the plaintiff had a vested right to the sum insured for; whereas he had no such right, not even contingently, unless he continued to pay the premiums. In this case the insured failed to pay the premiums, consequently he had no vested right to the insurance. Therefore there was no forfeiture, in the proper sense of the word, in respect to that.

The court also speaks of forfeiting the whole amount of premiums previously paid. This is only partially true. To a considerable extent he received a valuable consideration for the amount paid, in the risk which the company assumed during the time the policy was in force. So that the real

Worthington v. Charter Oak Life Ins. Co.

loss by a failure to pay is comparatively small. And the possibility of such a loss must be presumed to have been in the minds of the parties when entering into the contract, and considered by them accordingly. The possibility of a failure to pay was provided for in the provision in such case that "all payments made thereon shall be forfeited to the said company." In a hazardous contract that was a risk which the insured assumed. It is not, therefore, such a forfeiture as courts of equity will relieve against, much less will courts of law make a contract for the parties for the purpose of avoiding it.

Again. If this principle is to be applied to life insurance policies, there is no reason for limiting the application to cases of war. There is the same hardship, and, therefore, the same propriety in applying the rule to cases where the party, by accident, misfortune, or inevitable necessity, fails to pay the premiums. To apply the rule in such cases would make the companies insurers against all such contingencies, and that certainly will not be seriously claimed. This rule, too, if applicable at all, must be applied in all cases, whether few or many premiums have been paid. There is no room or reason for a distinction between the payment of one and many, except that each payment slightly increases the value of the right acquired. If but a single payment had been made, would any court seriously consider the propriety of straining the law or the contract for the purpose of saving a forfeiture ?

But this is not all. The application of this doctrine to cases where the payment of the premiums has been interrupted by war, fails to take a comprehensive view of the question at issue. It looks only to the immediate parties to the suit, and regards the policy as an isolated transaction; whereas, in fact, it is but one act, a small fraction indeed, of a vast system of business. It is a business, too, which is based upon a calculation of chances and a system of averages. The average duration of any number of insurable lives may be estimated with tolerable accuracy, and each person, of whatever age, in a healthy condition, has his "expectation

of life," which is known and relied upon. Some exceed and some fall short of the average. Hence, some pay more, some less; but the sum insured is the same, whether few or many premiums are paid. The company receives on one policy, in premiums and interest, more than it pays; on another, much less; but individual policies are not regarded; it is the average duration of life and the result of the business as a whole.

The proportion of those who will allow their policies to be forfeited is also a matter of calculation, and can be determined with reasonable certainty in advance. It is doubtful, however, whether these forfeitures operate in the end to the advantage of the companies. As a rule, the policies which lapse are the best risks for the insurers. As they drop out, the average of those which remain is materially reduced. But whether they gain or lose is not material. In ordinary times, the consequences of forfeited policies can be anticipated and provided for. The late war caused all policies subject to its operation to lapse temporarily. It will probably be found that a few only returned to pay their premiums at the close of the war. Of those, most, if not all, are cases in which the insured either died during the war, or survived it in impaired health. The application of the rule we are now considering to this class of cases, therefore, practically revives only the very worst risks for the company, and compels it to submit to the loss of all the better and more desirable risks. A court of justice should never relieve one party of a hardship, apparent or real, at the expense of the other. By so doing, possibly the court may impose a greater hardship than the one it relieves. If the contract relations of two persons are such that one or the other must suffer a hardship, each party being equally free from blame, the law will leave it precisely where the contract places it.

Let us consider the consequences of this doctrine to a single company. A large number of policies, many thousands perhaps, were outstanding in the seceding states. Some policyholders, doubtless, lost their lives in the field. In respect to them, the company is exempt from liability. Others were non-combatants. Of these, some, probably a small part of

the whole, died during the war, or since.   In all such cases, especially where the premiums were paid or tendered immediatcly after the war, the company will be called upon to pay the insurance.   But in the greater number of cases, where the holders of policies survived the war in health, the company has no means of compelling them to revive their policies and pay the arrearages of premiums, but must content itself in seeing them exercise their right of election by refusing to continue the old policy, and taking a new one, thereby saving several years' back premiums.   Now, if some means could be devised whereby all the policies held by non-combatants could be revived at the close of the war, and the payment of arrearages be compelled, there would be some justice in holding the company liable in those cases where the policies have terminated by the death of the insured.   But a rule of law which revives and enforces all those policies in which all the advantages are against the company, and leaves null and void all those policies in which the advantages are in favor of the company, is neither reasonable, befitting, nor just.

6.   One other question remains to be considered.   To what extent was this policy abrogated by the war?   The general principles of international law, which determine the effect of war upon existing contracts, are well established, clearly defined, and not difficult of application.   In the case of *The Rapid*, 8 Cranch, 155, JOHNSON, J., in speaking of the nature and consequences of a state of war, says:   " On this point there is really no difference of opinion among jurists; there can be none among those who will distinguish between what it is in itself, and what it ought to be under the influence of a benign morality and the modern practice of civilized nations.   In the state of war, nation is known to nation only by their armed exterior; each threatening the other with conquest or annihilation.   The individuals who compose the belligerent states exist, as to each other, in a state of utter occlusion.   If they meet, it is only in combat."   After speaking of some rules which have been introduced into modern warfare, and which owe their existence alto-

gether to mutual concessions, he adds: "On the subject which particularly affects this case, there has been no general relaxation. The universal sense of nations has acknowledged the demoralizing effects that would result from the admission of individual intercourse. The whole nation are embarked in one common bottom, and must be reconciled to submit to one common fate. Every individual of the one nation must acknowledge every individual of the other nation as his own enemy, because the enemy of his country." Again, on page 162, he says: "But the object, policy and spirit of the rule is, to cut off all communication or actual locomotive intercourse between individuals of the belligerent states. Negotiation or contract has, therefore, no necessary connection with the offense. Intercourse inconsistent with actual hostility is the offense against which the operation of the rule is directed; and by substituting this definition for that of trading with an enemy, an answer is given to this argument."

In *Griswold* v. *Waddington*, 16 Johnson, 479, Chancellor Kent referring to the case of *The Rapid*, says: "Here then we have the final consummation of this discussion, and the sanction of the doctrine we have been tracing, solemnly given by the highest judicial authority in the United States. It reaches to all interchange, or transfer, or removal of property, to all negotiations and contracts, to all communications, to all locomotive intercourse, to a state of utter occlusion, to any intercourse but one of open hostility, to any meeting but in actual combat."

In the case of *The Julia*, 8 Cranch, 181, Judge Story is equally explicit. On page 193 he says: "At the threshold of this inquiry, I lay it down as a fundamental proposition, that strictly speaking, in war, all intercourse between the subjects and citizens of the belligerent countries is illegal, unless sanctioned by the authority of the government, or in the exercise of the rights of humanity. I am aware that the proposition is usually laid down in more restricted terms by elementary writers, and is confined to commercial intercourse."

Again, on pages 194–195, he says: "But independent of all authority, it would seem a necessary result of a state of war, to suspend all negotiations and intercourse between the subjects of the belligerent nations. By the war every subject is placed in hostility to the adverse party. He is bound by every effort of his own to assist his own government, and to counteract the measures of its enemy. Every aid therefore by personal communication, or by other intercourse, which shall take off the pressure of the war, or foster the resources, or increase the comforts of the public enemy, is strictly inhibited." * * * * "The ground upon which a trading with the enemy is prohibited is not the criminal intentions of the parties engaged in it, or the direct and immediate injury to the state. The principle is extracted from a more enlarged policy, which looks to the general interests of the nations, which may be sacrificed under the temptations of unlimited intercourse, or sold by the cupidity of corrupted avarice."

We are aware that there is a tendency in modern times to soften the rigors of war, and relax the principles of international law, so far as they affect private property and rights. On this subject Chancellor KENT, in *Griswold* v. *Waddington*, says: "It is the business of government, and not of courts of justice, to relax the rules of war. The power that declares or carries on war may soften its evils, to every extent consistent with the public interest, of which it is in this instance the exclusive judge. It is its bounden duty to make war fulfill its end with the least possible mischief, and to hasten the blessings of peace." This is sound doctrine and throws all the responsibility where it properly belongs— upon the war-making power. It is the business of the courts to administer international law, and not to relax or modify it according to their notions of propriety. It is much wiser and safer to leave that matter with the power that makes and carries on the war. But we need not dwell longer upon the general principles which govern this case.

The law as stated above is pretty uniformly accepted by the modern cases as the established doctrine of this country.

They differ somewhat in its application.  The difficulty in applying it to a policy of life insurance arises from the complex nature of the contract.  There are cases which regard it as a contract of continuing performance, and therefore dissolved by war.   Others consider it a contract of periodical performance, and affected as the payment of a debt is, suspended or postponed until after the war.   On this point there has been much discussion.   We regard it as immaterial whether it is called by one name or another.   In terms it requires certain acts to be done annually or oftener.   On each act future rights and obligations depend.   It neither begins nor ends, but continues a contract, and one which contemplates future acts of performance by both parties.  As a rule each act requires intercourse or communication between enemies, whenever the parties to it are citizens of belligerent states.   War therefore dissolves the contract so far as it relates to insurance which depends upon the payment of the premiums after the commencement of the war.

The theory that the premium as it becomes due is a *debt*, is a fallacious one, and leads to erroneous conclusions.   It resembles a debt only in that it is a payment of money.   A debtor is under obligation to pay;  here no obligation exists.   The payment of a debt may be compelled;  payment of the premium is entirely optional with him who is to pay.   The intent accompanying the act, the object aimed at, and the consequences resulting therefrom, are essentially and radically different in the two cases.   The one discharges an obligation previously existing, and closes the transaction between the parties;  the other creates an obligation which did not previously exist, continues in force an existing contract which otherwise would have terminated, and contemplates future dealings between the parties.   While it is in form the payment of money, it is in substance the making of a contract.   The payment of a debt is only suspended; the making of a contract is prohibited by the war.

Is the contract executed or executory?   Is the payment of the annual premiums a condition precedent or subsequent?  On these points there has been little discussion.   Courts

have assumed one answer or the other, in reply to each, according as their decision has been for or against the company. Perhaps a categorical answer either way would not be strictly correct. In the case before us the premium was paid to January 14th, 1862. Up to that time it was an executed contract. No further act was required by either party. Had death intervened, the contract for future insurance would have ceased to exist, and nothing would have remained but to prove the death and pay the money—acts which pertain to the remedy. To that extent the contract was not dissolved by the war. By entering into the contract and paying the first premium the party acquired a right to continue the insurance during life. In that respect also it was an executed contract, and the party received all he contracted for—a mere right or privilege, which was unavailable, and without value, unless he complied with the conditions. The law prohibited him from complying, and therefore destroyed the right, precisely as it forbids the contract of partnership or affreightment, and thereby destroys the rights of the parties under it.

In relation to insurance after January 14th, 1862, which is the point that concerns this case, it is different. There is a manifest distinction between a *right to insure* and *actual insurance*. There was no actual insurance, and the party could obtain none, except by complying with the conditions, —an act to be done by him. It was an executory contract on his part, and the law preventing the execution of it by him, the contract was necessarily dissolved.

As to the nature of the condition. It has no reference to present insurance; that is unconditional. The right to future insurance is an existing right, which may be defeated by non-payment of the premium. As to that, it is clearly a condition subsequent. But the right is of such a nature that its existence absolutely depends upon payment. Future insurance is not an existing fact, and cannot exist except upon the payment of the premium. As to that it is as clearly a condition precedent. The war, preventing its performance, dissolved that part of the contract.

There are cases on this subject in which the courts have come to the same result that we have; but we have not deemed it necessary to notice them at length.   *Tate* v. *New York Mutual Life Ins. Co.*, U. S. Dist. Court of Tennessee, by EMMONS, J.;   *Dillard* v. *Manhattan Life Insurance Co.*, 44 Georgia, 119.   We are aware that the Court of Appeals in New York has taken a different view of the question. *Cohen* v. *New York Mutual Life Insurance Company*, 50 N. Y. 610;   *Sands* v. *New York Mutual Life Insurance Company*, 50 N. Y., 626;   *Martine* v. *International Life Insurance Company*, 53 N. Y., 339.   They rely, however, to a considerable extent, upon the authority of the cases we have been considering.   Not being satisfied with the reasons given in those cases, we have not regarded them as binding upon us, but have felt at liberty to consider the case upon principle, especially as we have been informed that the question has been before the Supreme Court of the United States, and no decision rendered, as the court was equally divided.

We advise the Superior Court that the demurrer should be sustained.

In this opinion PARK, C. J., and PARDEE, J., concurred; FOSTER and PHELPS, Js., dissented.