RANDOLPH B. MARTINE, Appellant, v. THE INTERNATIONAL LIFE INSURANCE SOCIETY OF LONDON et al., Respondents.

Where a firm is appointed to an agency, such agency ceases upon the death of one of the members of the firm, and the principal is not bound by the subsequent acts of a surviving member.

Where a foreign corporation has sought and obtained the privilege of carrying on its business here under regulations fixed by the statutes of this State, and has established a permanent general agency, and conducts its business here as a distinct organization in the same manner as domestic corporations; as to the business transacted here the corporation is to be regarded as domiciled and subject to the same obligations and liabilities as domestic institutions.

Accordingly, *held*, where a foreign life insurance company had complied with the provisions of the statutes authorizing it to carry on business in this State, and had opened an office in New York, where it conducted its business by general agents and a local board of directors, issuing policies here as a distinct organization, and where a policy had been thus issued prior to the war of the rebellion to a citizen of one of the late Confederate States, that payment of the premiums thereon was excused and the liability suspended during the war, and that where the insured

died before the close of the war no tender of the unpaid premiums was necessary at its close, but that the same could be adjusted by making proper deductions from the policy, and that the company was liable for the residue.

*Robinson* v. *The I. L. A. Society* (42 N. Y., 54), limited.

(Argued May 30, 1873; decided September 23, 1873.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, reversing a judgment in favor of plaintiff, entered upon the report of a referee and granting a new trial. (Reported below 62 Barb., 181.)

This was an action upon a policy of life insurance issued by the defendant, the International Life Insurance Society, upon the life of James Martine, of Fayetteville, North Carolina, for the sum of $5,000.

Defendant is a foreign corporation, organized under the laws of Great Britain. Upon compliance with the provisions of the insurance laws of this State it had been authorized to do business here, and had an office in the city of New York, under the direction of a local board of directors, acting and holding their meetings in said city, where policies were issued, premiums received and losses paid, and acting in all respects as a distinct organization. Its general agents here appointed agents in the other States. The firm of Stark & Pearce were appointed its agents at Fayetteville. The policy in suit was issued June 4th, 1851, dated at the New York office. The premiums were regularly paid up to and including the payment of June, 1861, to said agents. Prior to June, 1862, Stark died. The premiums for 1862, 1863 and 1864 were paid to Pearce, the surviving partner. ⸱ Martine died October 9, 1864. After his death, Hester Martine, his wife, to whom the policy was made payable, assigned the same to the plaintiff. Other facts appear in the opinion. The referee directed judgment for the full amount of the policy, with interest.

*F. R. Coudert* for the appellant. The payments made to Pearce after the death of Starke were valid, and plaintiff is

entitled to recover. (*Hamilton* v. *Mut. L. Ins. Co. of N. Y.*, 9 Blatch., 235, 253 ; *Robbins* v. *Fuller*, 24 N. Y., 570 ; Story on Cont., § 242 ; *Thurman* v. *Wells*, 18 Barb., 500 ; *McMorris* v. *Simpson*, 21 Wend., 610 ; *Borrodale* v. *Lecke*, 9 Barb., 611 ; 1 Parsons on Cont., 46, 47 [4th ed.] ; *Veasie* v. *Williams*, 8 How., 134 ; *Benedict* v. *Smith*, 10 Paige, 126 ; *McCullough* v. *McKee*, 16 Penn., 289.) The war suspended the contract as to payment of premiums, and no forfeiture for non-payment would arise while the war lasted. (*Sands* v. *N. Y. Life Ins. Co.*, 50 N. Y., 626 ; *The Protector*, 9 Wal., 617 ; *Hanger* v. *Abbott*, 6 id., 53.

*Burton N. Harrison* for the respondents. The agency of Starke & Pearce ended with the death of Stark, and the payments made to Pearce afterwards were not valid. (*Bouton* v. *Am. Mut. L. Ins. Co.*, 25 Conn., 542 ; S. C., 1 Big. L. & Ac. Ins. R., 59–62 ; Story on Agency, § 430, and authorities cited ; id., § 42, and authorities cited ; Dunlap's Paley on Agency, 177 ; *Green* v. *Miller*, 5 J. R., 39 ; *Brown* v. *Andrew*, 13 Jur., 938 ; Story on Bail., § 202 ; 1 Lindley on Part., 84, 211, citing *De Mazar* v. *Pybus* and *Kundoon* v. *Paylens*, 4 Vesey, 649 ; Parsons on Part., 7, 438, 449, and authorities cited ; *Van Keuren* v. *Parmelee*, 2 N. Y., 525 ; 1 Lindley on Part., 417 ; 1 Hil. on Cont., 624, 625 ; *Johnson* v. *Wilcox*, 25 Ind., 184 ; *Tasker* v. *Shepherd*, 6 Hurl. & Nor. [Exch. Ch.], 575 ; 5 Lans., 535 ; 62 Barb., 181.) After 1861 the assured was not excused from paying the premiums in New York or London. (*Oakley* v. *Martin*, 11 N. Y., 25 ; *Catlin* v. *Tobias*, 26 id., 47 ; *Harmony* v. *Bingham*, 12 id., 49 ; *Tompkins* v. *Dudley*, 25 id., 272.) The existence of the rebellion did not affect this case ; the insurer was a British corporation. (*Robinson's Case*, 52 Barb., 450 ; S. C., 42 N. Y., 54.)

CHURCH. Ch. J. The referee found that payments upon the policy had been duly made up to the death of Mr. Martine. The payment to the agents, Starke & Pearce, in April, 1861, was good. They were the agents of the defend-

ant at Fayetteville, North Carolina, and the assured had repeatedly been notified to pay the premiums at the office of their agency at that place.   The instructions to the agents as to the manner of receiving them, viz., upon receipts forwarded from the New York office, were never communicated to the assured, and she was not affected by them.   She was directed to pay at the office of their agent, and she had a right to comply with the direction.

The validity of the subsequent payments for 1862, 1863 and 1864 is more difficult to be maintained.   Between 1861 and 1862, Starke, one of the firm, died, and the payments were made to and received by Pearce, as surviving partner. The assured is chargeable with notice of the death of Starke, and the authority by which Pearce assumed to act, by the receipts executed and received for the premiums for those years.   He did not profess to be the agent of the defendant, but acted as the surviving partner of the firm who had been agents.   There is no authority to sustain his right to so act. The death of one member of a firm operates immediately and inevitably as a dissolution.   (Story on Part., § 317; Parsons, id., 438.)   During the existence of a partnership, each member is deemed to be authorized to transact any business for the firm, but upon dissolution this authority ceases, end the only authority of the survivor is to close up the business.   He has no right to create new obligations, nor indeed to do any thing in the name of the firm, except such as· is necessary in adjusting and closing its concerns.  .(*Van Keuren* v. *Parmelee*, 2 N. Y., 523.)   It is a general rule of the common law that an authority by a principal to two persons to do an act is joint, and the act must be concurred in by both.   (Dunlap's Paley on Agency, 177; *Green* v. *Miller*, 6 J. R., 39; 13 Jurist, 938; Story on Agency, § 42.) When a firm is appointed to an agency, this rule would necessarily be modified to the extent that either member of a firm could do any act within the scope of the agency, the same as he could perform any other partnership act.   By appointing a partnership firm it would be implied that the

authority was joint and several. But upon dissolution of the firm such an agency would cease. This is the necessary result of the principles alluded to. The principal would not be bound by the act of a surviving member of a firm, because he had never appointed him to act nor agreed to be responsible for his acts, and the latter could incur no obligation against the deceased member or his representatives.

The counsel for the appellant suggested that, as the notice to the assured required payment at the office of its agent in Fayetteville, she was justified in paying at the office of Starke & Pearce. The answer is, that if the company had no agent, then it had no office of an agent, and, as we have seen, the agency ceased upon the death of Starke. It is also suggested that it was the duty of the company to appoint an agent at that place to receive the premiums, and that it cannot take advantage of its own negligence. There is nothing in the contract indicating Fayetteville as the place of payment. The notices to pay at Fayetteville would justify such payments, so long as the privilege was unrecalled and the defendant had an agent there. Upon the death of Starke the agency ceased, which the assured must have known, and the defendant was under no legal obligation to appoint another, but the obligation to pay the premiums to the society remained. The case of *Hamilton* v. *Mutual Life Ins. Co.* (9 Blatch., 235) was different. By the contract the premiums were payable to an agent residing in Alabama, appointed in pursuance of a statute of that State, and required as a condition of transacting business there. The company revoked the agency, which prevented the assured from paying the premiums, and the court held the assured excused. Here there was no statute and no contract to pay or receive the premiums at the place where they were paid.

There were three notices produced for the years 1852, 1853 and 1855, which stated the time when the premiums for those years were due, and that they must be paid at the office of the Fayetteville agency within thirty days or the policy would be void, but two of them stated that the notice

was not required by the rules of the society, and that the want of it would not excuse non-payment. It was not a notice that all premiums must be paid at Fayetteville, but that those specified must be. The notices would have justified such payments so long as defendant had an agent there, but cannot be construed into a contract that the company must always have an agent at that place, or that payments might always be made there.

We think the General Term right in holding that the referee erred in finding the payments for the specified years duly made. This is irrespective of the effect of the war upon the transaction, but it disposes of the findings of the referee, which were reversed by the General Term.

It is now claimed that, within the principles recently adjudicated in the *Cohen and Sands Cases* (50 N. Y., 610, 626), payment of the premiums for the specified years was excused and the liability suspended during the existence of the war, and that the payments could be made at its close if promptly tendered. As the person whose life was insured died before the war closed, no tender of premiums was necessary, and they could be adjusted by making proper deductions from the amount of the policy. The two cases cited are controlling against the defendant in this case, unless the fact that the defendant was a foreign corporation takes it out from the operation of those decisions.

It is claimed that the defendant, being a foreign corporation, could acquire no domicile here; that it was a neutral, and could lawfully transact this business with the citizens of either belligerent, and that the respective obligations of the parties were not affected by the war. The case of *Robinson* v. *The Same*, defendant (42 N. Y., 54), seems to favor this defence. HUNT, J., says: "If it is conceded that a contract of insurance by a citizen of this State upon the life of a citizen of Virginia, in the year 1862, would have been avoided or suspended, on the ground that the condition of war will not permit such contracts between the citizens of States at war with each other, we do not then

reach the case before us.   This was a contract between a citizen of a neutral country and a citizen of a belligerent country."
* * * * * *  "Such contracts are valid by the laws of all countries."  It appeared in that case, as in this, that the defendant had a place of business in New York, and carried on the business of life insurance by general agents and a local board of directors; and it is averred in the answer, in this case, that it acted as a distinct organization within the United States, issuing policies, etc., under the direction of a board of directors, acting and holding their meetings in the city of New York, where it had an office, with directory and executive officers, who appointed agents throughout the United States.   The court observed as to these facts: "It is important to observe that the New York board were but agents, however general their character or unlimited their authority.   The principal was the company itself in England."   The authorities cited to support the decision, that the war did not affect the performance of the contract, were *Ludlow* v. *Bowne* (1 J. R., 1); *De Wolf* v. *Firemen's Ins. Co.* (20 J. R., 214; affirmed 2 Cow., 56). The first was an action upon a policy of insurance upon goods (not contraband), contracted to be sold and delivered to a French merchant at St. Vallery, and warranted to be American property.   War existed between England and France at the time, and the property was captured by an English cruiser on the voyage and condemned by a British Admiralty Court as French property.   Our Supreme Court held that the title to the property had not passed from the American merchant, and that the warranty was verified.   SPENCER, J., said: "By the law of nations a neutral has a right, with the exceptions of contraband goods and going to a blockaded post, to supply the belligerents."   The other case was analagous in its facts, and the same decision was reached.   The only principle established was that a neutral may carry on commerce with a belligerent during war, as well as in peace, with the exceptions above named.   The applicability of this principle to the circumstances of this case is not perceived, and it was

unnecessary to determine it in the Robinson case. That case was rightly decided, and the decision must have been the same if the defendant had been a domestic instead of a foreign corporation, upon the ground that the payments to the agent were properly made.

It is true that the residence of a corporation is in the State of its creation, and it is well established that such residence cannot be changed, and if it was a question of domicile merely, the point would be too clear for argument. It may be admitted, also, that it was competent for defendant, or any other foreign corporation, to make contracts of insurance upon the lives of citizens of either belligerent during our late war, and that neither the contracts nor their performance would be affected by the war. But this does not reach the case. The defendant sought and obtained the privilege of establishing and carrying on its business here under the regulations fixed by the statutes of this State. It established a permanent general agency, and conducted its business here as a distinct organization, and was permitted by law to do this in the same manner as domestic institutions. The business thus established and carried on in New York was designed to be confined to the United States, and necessarily partook of the national character as a privileged business. Chancellor KENT, in his Commentaries, says: "The position is a clear one, that if a person goes into a foreign country and engages in trade there, he is by the law of nations to be considered a merchant of that country, and a subject for all civil purposes, whether that country be hostile or neutral." (1 Kent Com., 84.) Nor is it invariably necessary that the residence be personal. While the general rule is that a principal transacting business in the ordinary way, through an agent, will not contract the character of a domiciled person, yet if the principal be trading not on the ordinary footing of a foreign trader, but as a privileged trader, such a privileged trade puts him on the same ground with their own subjects, and he would be considered as sufficiently invested with the national character by the residence of his agent. (Id.)

This contract was made in New York by authority of its laws. Although not stated in express terms that the premiums were to be paid there, it is evident from the facts that the parties contemplated payment there, unless otherwise directed, for convenience of the assured, by the local board. The repayment of money borrowed was expressly provided to be made in New York, and the organization of a local board and the privileges granted by our laws, as well as the acts of the parties, including the notices above referred to, indicate that these contracts were to be made and performed there. It was essentially an independent American business, and would be treated as such, I have no doubt, if war existed between this country and England. The mischief of communication between the parties would be the same as if the defendant was a domestic instead of a foreign corporation. The transfer of funds from the New York agency to the assured, in case of death, or the transfer of premiums, would not have been tolerated. It is claimed that if it was impossible to pay in New York, the assured was obliged to pay in London. I do not think this is the fair construction of the contract. The surrounding circumstances significantly repel this idea. True, the payments are to be made to the society, but that means to the society as locally organized. If the defendant's views are correct, all payments were legally required to be made in London, whether it was practicable to make them in New York or not. True, the defendant might have discontinued the business here; but our statute requires, in that event, the continuance of an agency for some purposes, and the continuance of the deposit for the benefit of policy holders, and if it should withdraw all agencies for receiving premiums, so that it was impracticable to pay them, it would be the fault of the company, of which it would not be permitted to take advantage. (9 Blatch., 235.) It would be most unreasonable for these foreign corporations to ask the privilege of doing business under our laws in competition with domestic institutions, and then to ask exemption from the obligations and liabilities which attach to

the latter. As to the business transacted here, the company must be regarded as domiciled by the residence of its general agents and its local organization. In 2 Gall., 235, STORY, J., lays down the rule " that when a person is engaged in the ordinary or extraordinary commerce of an enemy's country, upon the same footing and with the same advantages as a native resident subject, his property, so employed, is to be deemed incorporated into the general commerce of the country, and subject to be confiscated, be his residence where it may." The English Admiralty Courts have always maintained this doctrine. In 1 Rob. Ad. Cases, 15, it is laid down " that there is a traffic which stamps a national character on the individual, independent of that character which mere personal residence may give him." (See also 5 Rob., 302; 4 id., 109; 1 Duer on Ins., 527.) The assured did all she could to make payment of the premiums. It was not lawful to make payments in New York, where they were to be made.

The defendant claims that the plaintiff purchased the claim as attorney for the purpose of prosecution, in violation of the statute. There is no finding upon the subject, and the evidence is not conclusive either that the plaintiff was a lawyer at the time of the assignment of the claim, or that he, in fact, purchased it with the prohibited intent within the meaning of the statute.

It is also insisted that the obligation of the defendant to pay was not absolute, but only that certain funds of the society should be subject and liable to pay the assured. This point was not raised upon the trial. If it had been, it might have been avoided. The defendant must be presumed to have waived it. The premiums not paid must be allowed.

The order granting a new trial must be reversed, and judgment of referee modified, by deducting the premiums payable in 1862, 1863 and 1864, with interest, and, as modified, affirmed without costs to either party as against the other.

All concur, except GROVER, J., not voting.

Judgment accordingly.