## Case No. 1,430.

### BIRD v. PENN MUT. LIFE INS. CO.

[33 Leg. Int. 54;[1] 1 Law & Eq. Rep. 505; 2
N. Y. Wkly. Dig. 83; 11 Phila. 485; 2 Wkly.
Notes Cas. 410; 5 Ins. Law J. 449; 23 Pittsb.
Leg. J. 112; 5 Bigelow, Ins. Cas. 487.]

Circuit Court, E. D. Pennsylvania. Feb. 7,
1876.

INSURANCE — CIVIL WAR — NONPAYMENT OF PRE-
MIUM — TENDER — WAIVER BY NOTICE OF FOR-
FEITURE—REINSTATEMENT.

1. A life insurance for a year was effected
in 1847 at a certain premium, with the privilege
of continuing the insurance from year to year on
payment of a premium of equal amount before
the end of each year; and it was provided
that if any annual premium should not be paid
within the time limited, the insurers should not
be liable to pay the sum insured, and the policy
should determine, &c. The insured paid the
premiums yearly till 1861. He was an inhabit-
ant of Virginia. The insurers were incorpo-
rated by the legislature of Pennsylvania, in
which state their business was transacted. The
Civil War which broke out in 1861 disabled
them from receiving, and the insured from pay-
ing, the premiums in that year and until 1865.
Upon the termination of the hostilities, he in-
quired of them by letter what steps he must
take to continue his insurance. They answered
that it was forfeited for non-payment of the
premium in 1861, and that it would not be re-
vived by them. *Held*, that this answer dis-
pensed with an actual tender of the premiums,
and that the question of his right to continue
the insurance ought to be decided as if he had
tendered them with interest.

[See Blight v. Ashley, Case No. 1,541.]

2. It seems that a court of equity should re-
lieve him against the forfeiture, and reinstate
him in the insurance on his making compensa-
tion by payment of all the premiums with in-
terest on each.

[See New York Life Ins. Co. v. Statham,
93 U. S. 24; Hancock v. New York Life
Ins. Co., Case No. 6,011.]

[See note at end of case.]

3. Life insurance distinguished, as to such a
question, from fire insurance.

4. Quaere, whether his representatives would
have been relievable if he had died before the
end of the Civil War, so that his option to con-
tinue the insurance could not have been exer-
cised before the absolute termination of the
risk insured against.

5. The cases of Mutual Life Ins. Co. v. Ham-
ilton, and Tait v. New York Life Ins. Co., (in
each of which the judges of the supreme court
of the United States were equally divided in
opinion,) considered.

[See note at end of case.]

In equity. The defendants are a mutual
insurance company incorporated by the leg-
islature of Pennsylvania by a charter under
which they carry on their business in the
city of Philadelphia. In September, 1847,
they executed and delivered to the complain-
ant at Philadelphia a sealed policy of insur-
ance in $5000 upon his life, payable to his
wife. The premium paid was $155.50. The
insurance was for a year, with the privilege
of continuing it from year to year on pay-
ment of a premium of equal amount before
the end of each year. The policy contained

a provision that if the assured should not
make the annual payments on or before the
several days appointed, then, and in every
such case, the defendants should not be lia-
ble to the payment of the sum insured or
any part thereof, and the policy should cease
and determine, and all previous payments
made thereon, and all profits for which scrip
should not have been issued, should be for-
feited to the defendants. The complainant
continued to pay the annual premiums punc-
tually at Philadelphia until 1861, when the
whole sum thus paid had amounted to $2177.
He was a resident of the state of Virginia.
The Civil War, which broke out in April,
1861, prevented him from paying the pre-
miums in September, 1861, and subsequent-
ly; and made it unlawful for the defendants
to receive any such payment during the con-
tinuance of the hostilities. The defendants,
from time to time, declared certain divi-
dends payable to their policy holders. In the
year 1859, the complainant had borrowed
from the defendants $600, when they took
from him the policy and a pledge of the ac-
crued and accruing dividends as their secu-
rity for the loan. At various times he made
payments on account of this loan until it
was reduced, in the spring of 1861, to $250,
for which balance they held his note paya-
ble on 27th April, 1861. The defendants, be-
ing in possession of the policy, treated the
insurance as ended by reason of the non-
payment of the premium in September, 1861;
and wrote upon the policy that it was "for-
feited" and "cancelled," obliterating the sig-
natures of their officers. In 1862 they closed
his accounts on their books by crediting
on account of the note, $52.73, which was
due to him on their deposit book, and apply-
ing $210 of the dividends accrued, to the pay-
ment of the balance of the note with inter-
est. This left in their hands about $620 of
dividends unpaid. Independently of any
question as to termination of the insurance,
the further dividends on the policy from Jan-
uary, 1862, to January, 1866, would have been
about $320, making, in the whole about $940,
after deducting the $210. On the termina-
tion of the hostilities, the complainant, by a
letter of 31st May, 1865, inquired of the de-
fendants whether any profits of his life in-
surance were in their hands, and also ex-
pressed a desire to know what steps he must
take to continue his insurance. On 9th June,
1865, they wrote in answer stating that on
the former account they held $620, subject
to his order; and added, "The policy of in-
surance was forfeited for non-payment of
premium in 1861, and will not now be re-
vived by the company." In a subsequent
correspondence, the complainant contended
that the defendants ought to have applied
the dividends in payment of accruing premi-
ums. The defendants insisted that the insur-
ance was absolutely forfeited, and, through-
out the correspondence, treated the dividends
as a distinct matter. In October, 1866, the

[1] [Reprinted from 33 Leg. Int. 54, by permis-
sion.]

account as to the dividends prior to the Civil War was settled by the complainant with the defendants on the footing dictated by them. He thereupon received from them on this account $591.20. In the following year, he renewed the correspondence, urging his right to be reinstated in the insurance, but resting the claim upon considerations which were honorary rather than legal. He seems to have supposed that he had no legal right, but a strong moral claim on their liberality. They repeated, and never in anywise qualified, their original declaration that the insurance was forfeited. The correspondence was closed in December, 1867.

The bill was filed on 2d July, 1874. Its purposes were that the policy, &c., still in the possession of the defendants, should be exhibited by them, that the complainant should be permitted to pay all the accrued premiums which are unpaid, that the policy be declared valid and to have remained in force, and that the defendants should account for all the dividends which had been, or ought to have been, declared upon it, deducting the $591.20 received as above in 1866.

The defendants, by their answer, and in argument, insisted that the insurance had been forfeited in 1861, that the accounts of all dependencies then outstanding were adjusted and finally closed by the settlement of 1866, that the complainant had never made any tender of the premiums in question, and that his delay to institute the present proceedings ought to preclude him from relief if he were otherwise equitably entitled to it.

Mr. E. F. Pugh, for the complainant, cited many authorities, relying principally upon New York Life Ins. Co. v. Clopton, 7 Bush, 179; Manhattan Life Ins. Co. v. Warwick, 20 Grat. 621; Cohn v. New York Mut. Life Ins. Co., 50 N. Y. 610; Sands v. Mutual Life Ins. Co., Id. 626; Hillyard v. Mutual Ben. Life Ins. Co., 35 N. J. Law, 415, affirmed in court of appeals, (Feb., 1875,) 4 Ins. Law J. 127, (and see Am. Law T. Rep. June, 1875;) Hancock v. New York Life Ins. Co., [Case No. 6,011;] New York Life Ins. Co. v. White, 4 Bigelow, Ins. Cas. 471; Hamilton v. New York Mut. Ins. Co., [Case No. 5,986,] affirmed on appeal by the supreme court of the United States, the judges being equally divided in opinion.

Mr. S. B. Huey, for the defendants, cited Dillard v. Manhattan Life Ins. Co., 44 Ga. 120, and other cases, relying principally upon Tait v. New York Life Ins. Co., [Case No. 13,726,] affirmed on appeal by the supreme court of the United States, the judges being equally divided in opinion. [See note at end of case.]

CADWALADER, District Judge. If the complainant were otherwise entitled to be reinstated in the insurance, he ought not to lose the right merely because, at a former time, under a mistake, he supposed the contrary. Nor should he suffer because he, at one time, erroneously supposed that the defendants ought to have applied the dividends in payment of accruing premiums. This was a mistake on his part, even upon the supposition that the dividends were of sufficient amount, and that he would, in ordinary times, have had an option to continue the insurance annually by such an application of dividends. The position would, even in that view of the case, have been erroneous, not only by reason of the effect of the hostilities, but also because a declared exercise by him of the option would have been indispensable. The defendants were certainly right in treating the dividends as a matter wholly distinct from the question of termination of the insurance. The defendants are, however, for this very reason, in the wrong, if they insist that the settlement with them by the complainant of the account as to the dividends ought to be deemed a waiver of his demand to be reinstated in the insurance. The two subjects are, I repeat, wholly distinct. This being so, it was, according to his own theory of his case, necessary that, on the termination of the hostilities, he should tender the accrued premiums to the defendants, unless they dispensed with such a tender. There was no actual tender of the premiums with or without interest. But an actual tender was, in effect, dispensed with by the defendants' answer to one of his inquiries in the letter of the 31st of May, 1865. This inquiry was, what steps he must take to continue the insurance? The answer was, that the insurance had been forfeited for non-payment of the premium in 1861, and would not be revived by them. This meant that no tender to renew or continue it would be accepted. Such a tender would afterwards have been a purely idle formality. The case, therefore, is to be decided as it ought to have been if he had made an actual tender of the proper amount, whatever it may have been. The question is, whether such a tender, not made until the return of peace, would have been too late to avail him. Did an insured inhabitant of one of the revolted southern states, who was prevented by the Civil War from paying the annual premium to insurers in a northern state, lose at once and irrevocably his option to continue the insurance?

The rules which determine whether impossibility to perform a contract will excuse its non-performance are not always applicable to questions of relief against forfeitures incurred through non-performance of conditions. There was no contract of the complainant that he would continue the insurance by payment of the annual premium before the end of the first, or before the end of any subsequent year. Any such payment on his part was optional. Until his election to make such payment within such limited time or times, there could not, on the other side, according to the form of the contract,

be any ascertained conventional obligation of the defendants to continue the insurance beyond the end of a current year. The conventional continuance of the insurance depending upon this optional payment by the complainant within the year, such payment, within this limited time, was a condition precedent to such continuance. 9 Ch. App. 502; and see L. R. 9 Eq. 705; L. R. 17 Eq. 316–320. The decision of the case depends, therefore, upon rules of legal and equitable jurisprudence on the subject of conditions precedent.

Impossibility to perform a condition precedent does not, at law, prevent the loss of that which depends upon performance. It is, therefore, unnecessary to consider whether, if the present suit had been upon the law side of this court, compensation for the non-performance could be estimated by a standard of sufficient legal certainty, or to consider whether a court of law would be able to regulate properly the application of such a standard. Independently of any such question as to compensation, there was an absolute forfeiture at law from non-payment within the time limited. If this had even been otherwise, it would have been impossible, on the law side of the court, to disregard the express provision of the policy upon the subject.

But the question here to be decided arises on the equity side of the court. A court of equity, in certain cases, disregards express provisions imposing forfeitures for breaches of conditions precedent or subsequent. Such a court considers not the form of words used, but the differences in the nature of the conditions. But the court will not relieve against any breach of a condition of either kind unless the sufferer has lost something really valuable, and the party who would be substantially benefited by the forfeiture can be adequately compensated, so that both parties may be put in the same situation as if the condition had been performed: 1 Salk. 231, 232; 2 Vern., 338, 339, 344; 1 Vern. 223; 1 Brown, Ch. 168.

We may therefore inquire, first, whether such loss has been incurred, and secondly, whether such compensation can be made.

Under the first of these inquiries, there is, in principle, no resemblance to a question upon the renewal of an insurance against fire. Fire insurance and life insurance are so far alike that each is an aleatory contract. But in fire insurance there is uncertainty both as to time, and as to event. Fire is not inevitable. Moreover the inanimate subject of insurance against fire may, for the practical purposes of the contract, be considered normally unchangeable, both in value, and as to hazard. Usually the party insured for a limited period against fire has no exclusive option to renew the insurance. When renewable, it can be renewed only by mutual consent. Even if this were conventionally arranged otherwise, and the option were exclusively his own, it would be an option of no appreciable value. The risk and the market rate of premium being both, from year to year, normally the same, the expense of making an independent new fire insurance with other insurers, does not normally exceed that of the renewal of a former insurance, except in the mere cost of a new policy, and of a stamp where the law requires one. But in the case of a life insurance, the event is not uncertain except only as to the time of its occurrence. Death at some time is inevitable. The consequences of this difference are, in many respects, very material. See 15 C. B. 374, 389–392. When there is an option to renew, or, in more proper language, to continue the insurance from year to year, this option belongs exclusively to the party insured. It is a valuable right or privilege; and is of constantly increasing value for two reasons. The first is, that the health of the insured may fail during the first or any other year, so that his life would not, at the end of such year, be insurable at the same rate, or even perhaps at any rate of premium. Nevertheless, he has a right to the benefit of continuing the insurance at the conventional rate. See L. R. 9 Eq. 719; L. R. 19 Eq. 79, 83; also 6 Ch. App. 386, 387. The second reason is, that although he may continue in sound health, he is, at every succeeding instant of time, nearer to death. The market rate of premium for an independent new insurance meanwhile is, for this reason, constantly increasing; but under his policy the conventional rate of annual premium continues to be the same. For this twofold benefit he pays a full, and sometimes more than adequate consideration. In the present case, the insurance had, before the Civil War, been continued more than fourteen years; and the amount of premiums paid, with interest, was, at the commencement of the war, not less than three-fifths of the sum insured. This, if the defence prevails, the complainant loses irrevocably. Moreover, under the most favorable condition of his health, he could not, at the commencement of the war, have effected an independent new insurance at an annual premium of less than almost double the conventional rate of the annual premium fixed in the defendants' policy. These proportions may be, in part, varied in the present case of a mutual insurance company, by dividends of accrued profits. But the difference cannot affect the principle in question. His option to continue the insurance on fulfilling the condition precedent was thus a right of real value. It resembles, in this respect, and in some other respects, a tenant's right of renewal of a lease of land for lives. We may, from judicial precedents on the other side of the Atlantic, take as a pertinent example, a tenancy at a certain rent, for three lives, renewable perpetually at the same rent, on the payment of a fine within a certain limit of time from the fall-

ing in of any life. The so-called fine is not of the nature of a penalty; but is merely a certain sum which, in addition to the rent, is payable on a death, for the renewal of the lease. In some such leases there is, and in others there is not, a covenant of the tenant that the fines shall be paid. In the latter cases the payment is optional with him and his representatives. In these cases the value of the tenancy, in proportion to the annual rent, may be considered as constantly increasing. It is the ordinary purpose of such leases to encourage the erection of buildings, or to promote the improvement of agriculture; and the right of perpetual renewal induces expenditures for such permanent objects. But the value of unimproved land may continue the same, or it may deteriorate; and therefore perhaps, in the absence of an express covenant to build or otherwise improve, the increase in value from such causes may be considered merely contingent. However this may be, the amount of the tenant's investment is absolutely and permanently increased by his first and every subsequent payment of a fine upon the falling in of a life. This appreciable increase of his investment attendant upon the exercise of his option to renew, directly resembles the effect of the payment of annual premiums for the continuance of a life insurance. The option is, in each case, a valuable right.

The second inquiry is, whether compensation can be made. This inquiry may always be understood as impliedly including the first, because where compensation is required, the subject must be of some value. In many cases where the subject is of real value, there is no practicable standard for equitable compensation, even though the condition may be a subsequent one. See these cases reviewed in 2 Price. 200; and see 10 Ch. App. 626. But there can be no such difficulty where performance would have consisted in the payment of a certain amount of money, and the only subject of ultimate forfeiture would also be money. In the present case, the complainant, if otherwise relievable, can make adequate equitable compensation by paying the annual premiums with interest upon each of them. In the cases already mentioned of leases for years renewable forever, there was a difficulty in making compensation to the landlord, where, after the falling in of a life, a lapse of the right of renewal at law had occurred from nonpayment of the fine within the time limited. The difficulty arose upon considering that, on the falling in of a life, such a postponement by the tenant of the nomination of a new life, postponed, in effect, the chance of another death, and thus diminished the probable frequency of the payment of the fines attendant upon deaths. The difficulty was overcome by estimating seven years to be, according to known analogies, the reasonable average duration of every such life as the tenant might have named in due season.

3FED.CAS.—28

The compensation, where relief could otherwise be given, was, therefore, computed as including the first fine, and an estimated additional fine of equal amount at the end of every seven years of the whole interval elapsed; and interest was charged as on the first fine, and every additional septennial amount: Sweet v. Anderson, (A. D. 1772,) 2 Brown Parl. Cas. 257, (430,) cited with approval by Lord Mansfield, in 1 Ridg. App. 137, and by Lord Redesdale in 2 Schoales & L. 686. In the present case there cannot be any such difficulty. The premiums are of invariable amount, and of stated annual recurrence. In language of Lord Wensleydale, "the liability of the insurer" is "constant and uniform to pay an unvarying sum on the death of the cestui que vie, in consideration of an unvarying and uniform premium paid by the insured. The bargain is fixed as to the amount on both sides." 15 C. B. 389. If it be objected that the defendants were entitled to use the premiums in their current business of insurance, and that they might, through such use, have made profits exceeding the interest—the answer to the objection is that interest is estimated an equivalent for speculative compensation where a cognizable equity would otherwise be defeated. See Story, Eq. Jur. § 1316 in the note. If this were at all doubtful, it might be added that against the chance of greater profit was the hazard of more than proportionate losses, and that, in this particular case, the complainant would be entitled, on the principles of mutual insurance, to his own due proportion of accrued profits. Under contracts to pay money, interest does not accrue while war suspends payment of the principal debt. The rule ought to be different in defining the measure of compensation to relieve against a forfeiture occurring, as this did, through postponement of the right of election. Unless interest, or a sum equal to it, were allowable, full compensation would not be made. Whether, if the complainant is relievable in the present case, he should be required to pay such interest for the period since the defendants' letter of June, 1865, will depend upon the effect of this letter; and may perhaps be a question of some difficulty hereafter. But independently of this question, a sum equal to full interest on each premium ought certainly to be added.

The case, therefore, is one in which, if relief would otherwise be proper, adequate compensation can be made. In 1 Vern. 223, Lord Keeper Guilford said that "in all cases where the matter lies in compensation, be the condition precedent or subsequent, he thought there ought to be relief." There is, however, the following important difference, in this respect, between the breach of a precedent, and that of a subsequent condition. In the latter case, relief may be given where compensation can be made, although the non-performance of the condition has occurred through mere negligence of the suffer-

er, unless it has been wilful or perverse neglect. But a court of equity does not, in any case, relieve against losses consequent at law upon the non-performance of a condition precedent where such non-performance occurs through neglect alone, or other fault of the sufferer. A reference to authorities on this point may elucidate the general subject. They are found in decisions upon cases already more than once mentioned, of the forfeiture of rights of renewal of leases for lives through non-payment of a fine by the tenant within the appointed period after the occurrence of a death. We have seen that if a lapse occurs through such omission, there is, on the one hand, a forfeiture of a valuable right, and there can, on the other hand, be adequate compensation. An existing tenancy under a lease renewable forever is very like a present fee, and the loss which the tenant would incur at law, through such a lapse, has no small resemblance to some other forfeitures which may occur through non-performance of conditions subsequent. The resemblance does not suffice to make the condition a subsequent one. Payment of the fine is clearly a condition precedent to the legal right of renewal. But there can be no supposable case of breach of a precedent condition which would be more entitled to favorable consideration. Thereupon arose the question whether equity would relieve where the lapse had occurred through the tenant's own mere neglect, or mere insolvency. The English chancery and exchequer, as courts of original equitable jurisdiction, have uniformly refused to give relief in cases of this kind. See the case, A. D. 1738, Fonbl. Eq. 425n; also, 3 Brown, Ch. 529; 3 Ves. 295, 690; 11 Price, 3; and 13 Price, 694, McClel. 464. Irish courts of equity have, on the contrary, relieved against the legal consequences of such lapse where the default has occurred through mere neglect without any fraud. But these Irish decisions were overruled, and two of them reversed by the house of lords in England in 1776 and 1779. Kane v. Hamilton, 1 Ridg. App. 180; Bateman v. Murray, 5 Brown, Parl. Cas. 20, 1 Ridg. App. 187. The latter of these judgments of reversal was followed in 1780 by the enactment of an Irish statute, known as the "Tenantry Act." 19 & 20 Geo. III. c. 30. This act was partly declaratory and partly remedial. See the statute itself, and 2 Schoales & L. 681. It restored for Ireland what has been there called the local equity, or the old equity of the tenants in cases of neglect without fraud, unless it should appear that the landlord had demanded the fine or fines, and that the same had not been paid within a reasonable time after such demand. Some subsequent decisions in Ireland, if not reversed on appeal, might have induced an erroneous belief that under the so called "old equity" as revived by the act, the tenants had "a right to delay the renewal of their leases as long as they pleased." But these decisions have been re-

versed in England by the house of lords. See the review of these cases in Sugden on the Law of Property, as administered by the house of lords, (pages 556–570.) Out of Ireland it is not a cognizable equity; and neither these Irish decisions since the tenantry act, nor the judgments on appeal from them, are of any importance out of that country. In the present case the complainant, therefore, by non-payment of the premium within the year ending in September, 1861, would have lost irrevocably the option to continue his insurance if the payment had not been unavoidably prevented. See Edwards v. Warden, 9 Ch. App. 502, and the case in the house of lords, mentioned in L. R. 19 Eq. 608–610, 612. But the payment of this, and of the subsequent premiums, within the times limited, was unavoidably prevented; and there was, in fact, no negligence whatever on his part. Where the breach of a condition precedent is excusable, and compensation can be made, the general rule of equity is to relieve against a forfeiture.

But what will make the breach excusable? If the condition is annexed to land, or to some other specific subject, a very indulgent latitude of excuses appears to have been allowed. Recurring once more to leases for lives renewable forever, we find opinions of Lord Thurlow in the house of lords, (1 Ridg. App. 202,) and of Lord Alvanley at the rolls, (3 Ves. 693,) that any disabling accident, misfortune or surprise, or ignorance not wilful, which prevents the tenant from applying at the stated times for renewal according to the terms of his lease, will afford sufficient reason for giving relief to him in equity against the lapse at law. Relief has even been given where performance had been prevented by so called impossibilities which were not absolute, but only relative. Lord Mansfield said in the house of lords in 1776, that the decision of such cases depended upon their peculiar circumstances. 1 Ridg. App. 185. He said this with reference to previous cases in the house of lords in which relief had been given. In one of those cases, payment had been delayed by an unavoidable uncertainty whether a life had in fact fallen in or not. The decision was that, assuming the death in question to have happened in this interval of uncertainty, and the lapse to have occurred, the tenant was nevertheless relievable. Sweet v. Anderson, (A. D. 1772,) cited above. Where nothing specific has been forfeited at law, but the ultimate forfeiture would be only that of a right to a certain sum of money, there is not sufficient reason for such indulgent relief, though, as we have seen, compensation can more readily be made. The abstract principle of equity is, indeed, the same; but its application is restrained and qualified by practical considerations. In cases of life insurance, under this and other heads, we find the law of conditions modified by such considerations. See 12

East, 183, 186, 187. In the absence of a strong equitable necessity, there should be nothing precarious in this part of the business of insurers. They have a right to insist on the utmost practicable punctuality in the fulfilment of every condition upon which a risk is to be incurred or continued. Contingent relative impossibilities, if always recognizable as excuses, would render the option to renew or continue the risk from year to year too uncertain a part of the contract of life insurance. We may, therefore, discriminate between relative and absolute impossibilities. But in doing so, it is not, for any present purposes, necessary to define precisely the equitable standard of sufficiency of an excuse for lapse from delay in the payment of the annual premium. Assuming that nothing short of absolute impossibility should be admitted as an excuse, the temporary impossibility was, in the present case, absolute. A court of equity ought certainly to recognize the sufficiency of such an excuse. Let us, for example, suppose that, through a judgment under a quo warranto, the charter of the defendants had been forfeited in 1861, that the judgment of forfeiture had been reversed in 1865, and that consequently, during this interval, their corporate faculties had been suspended, so that there was no person capable of receiving the premiums. In such a case, the disability would, in itself, create an equitable excuse. In the present case we may further consider the peculiarity of the cause of the impossibility. Its cause was the suspension of conventional relations, and the unlawfulness of intercourse between enemies. In addition to the disability of the insured as an enemy to make payment, it was, during the war, unlawful for the insurers to receive any payment from an enemy. Their corporate faculties were, in this respect, suspended, as it were, so that if he had been able to offer payment, it could not have been accepted by them. But it has been suggested that the cause of this temporary disability was the Civil War, which, in its penal effects, made the excuse of impossibility inadmissible here, though it would otherwise have been a sufficient excuse. If we were to trace a succession of causes immediate and remoter, it might, perhaps, be said that the cause of the forfeiture was the absolute impossibility of payment of the premium within the limit of time; that the cause of this impossibility was the suspension of intercourse and of conventional relations between enemies; and that the war was the cause of the non-intercourse, and of the suspension of conventional relations. But this would be over-nice reasoning. The suggestion is that the subject is not thus divisible, and that the war, in itself, was the proximate cause, or, practically speaking, the only cause. If so, what was its effect? Did it produce or occasion any forfeiture whatever?

In time of war, between enemies, new conventional rights are not acquirable, and new obligations are not incurrable. Moreover, any rights or obligations which existed at the commencement of the war may, by confiscation, be extinguished. But in the late Civil War there was neither legislative nor judicial confiscation of the present subject of controversy; and, where confiscation is not actually enforced, pre-existing rights and obligations are not extinguished by war. They are only suspended until peace. The rules of law are the same as to a rebellion so organized as to create a temporary state of war. Therefore, the war was not a cause of any forfeiture. None was incurred in addition to that incurred at law through the mere non-payment of the premium. The impossibility of payment of it was thus in equity a sufficient excuse for non-performance of the condition in question. The complainant thus appears to be entitled to an interlocutory decree for an account of his share of the profits of the defendants' business since those credited in their settlement with him, which resulted in the payment of $591.20. Whatever he may be entitled to under this head should be deducted from the amounts of the premiums of 1861, and the subsequent years, with interest. When the interest should cease may be a deferred question. Upon his payment of the balance, when ascertained, to the defendants, or if they will not receive it, into the registry of the court, the final decree should reinstate him in the insurance, and direct the policy now in their possession to be returned to him, with as beneficial effect as if it had not been cancelled or defaced; and they should be prohibited from pleading, in any future action upon it, either that it is not their deed, or that any premium or premiums thus paid under the decree were not paid within the times respectively limited.

The subject has been considered almost wholly upon original grounds, because in cases more or less like the present, the conflict of opinion, since the war, has been apparently quite irreconcilable. It will not be necessary to mention any of the opposing decisions of state courts. On 6th of April, 1874, the judges of the supreme court of the United States, being equally divided in opinion upon two cases which had been very fully argued, affirmed in each case the judgment of a circuit court of the United States, without giving any reason except the division of opinion. In each case a policy of life insurance had contained a provision like that of which the effect is here in question. The decision below in one of these two cases (Hamilton v. Mutual Life Ins. Co.) is reported in [Case No. 5,986.] The insured had survived the war. So soon as the insurers, upon the return of peace, could lawfully receive any payment from him, he had tendered to them the amount of all the annual

premiums for the period of the war. The tender was not accepted. He afterwards died; and, under proceedings in equity at the suit of his executor in the circuit court for the southern district of New York, the complainant was reinstated in the insurance. According to this decision of the circuit court, the present complainant should have relief. In the other case (Tait v. New York Life Ins. Co.) [Id. 13,726] the party insured had not survived the Civil War, but had died in the early part of it, after non-payment of a single annual premium. On the termination of the hostilities, his representatives tendered to the insurers the unpaid premium, and afterwards brought a suit in equity against them in a court of the state of Tennessee. The suit was removed into the circuit court of the United States for the western district of Tennessee. On examination of the printed record in the supreme court, it appears that the proceedings in the circuit court were such, that the counsel, on each side, doubted whether the hearing or trial was to be on the law side or on the equity side of the court. But all difficulty under this head was removed by an agreement which became part of the record. The decision of the circuit court was that the plaintiffs had no right of action at law or in equity. The opinion of that court is in 2 Ins. Law J. 861, and 4 Bigelow, Ins. Cas. 479n, [Case No. 13,726,] without a sufficiently full prefatory statement of the case. As between the parties litigant, and as to all persons privy in interest, the affirmance of these two judgments by an equally divided appellate court, was not less conclusive than if a majority of the court of appeal had concurred in the judgment of affirmance. But the supreme court of the United States have more than once intimated that such a decision is not, in that court, considered as a judicial precedent, establishing authoritatively any principle as applicable to subsequent cases of a like character between other parties: [Etting v. Bank of U. S.,] 11 Wheat. [24 U. S.] 59, 78; [Durant v. Essex Co.,] 7 Wall. [74 U. S.] 107, 113. A dictum of Judge Grier, (Id. 109,) attributing greater force to it, as an authoritative judicial precedent, must therefore be disregarded. But the authority of a decision of a circuit court cannot, after such an affirmance, be disregarded in the same or in other circuit courts, until a subsequent decision of the supreme court to the contrary. This remark might apply to either of the two decisions now in question if the other one had not also occurred. This introduces an inquiry, whether the two decisions in the circuit courts are irreconcilably conflicting. The judicial reasoning which appears by the reports to have induced the respective decisions cannot be reconciled. But the points which were actually decided may reasonably consist with each other. The difference between the cases has already been stated. It is that, in the Tennessee case, the person insured had not, as in the New York case (and in the present case) survived the war, and elected to make compensation. In the Tennessee case, therefore, compensation, if made, could not continue an insurance. The insurance had been upon a life which was ended. There was not, as in the other cases, a continuing risk; nor was there an option to be prolonged. The option was already gone. The offer of compensation could only in substance and effect be a proposed credit in reduction of the amount of money insured. There could be no absolute certainty that, if there had been no war, the person insured would have elected to pay the premium in 1861. His former motives for insuring might have ceased to exist; but, on his death, his representatives could not, if they had a continuing right of election, have any possible motive to forbear the exercise of it. Such cases have been compared to an option to buy a lottery ticket, where the election to buy is not made until after the ticket has drawn a prize, (9 Ch. App. 503,) or to buy the haul of a seine, where the election is deferred until after the net has been drawn in. The distinction is neither strengthened nor weakened by the decisions which have arisen in the course of proceedings to wind up insolvent insurance companies under the English statute of 1862, called the "Companies Act." Under such proceedings all the business of an insolvent English company terminates, and all the funds and assets pass into the hands of an official liquidator. The effect of the statute is to determine for certain purposes, the rights of all parties with reference to the time of the commencement of the proceedings to wind up the business. The interest of every party insured on which he may claim a dividend is the estimated value of his insurance, when he makes his proof. The continuance of such a transmuted interest cannot depend upon payment by him of premiums which it would have been necessary for him to pay in order to continue the insurance if the proceedings to wind up had not been instituted. Therefore, no such payment is required. L. R. 9 Eq. 705, 706. If he is alive, the valuation of his interest is the amount of money which, at his increased age, and in his actual state of health, good or bad, he would be obliged to pay, at this time, in order to effect an equally beneficial insurance on his life with a solvent insurance company. L. R. 9 Eq. 716–719, 14 Eq. 79, 83; 6 Ch. App. 386, 387. If he dies before making proof, his representatives may claim; and the value may then be estimated as equal, or approximately equal, to the sum insured, less the amount of any premium or premiums which would have been payable for continuing the insurance if the company had not been wound up. But in the latter case, the death does not create a claim to this

difference, otherwise than as it happens to be a proper method of approximately adjusting the valuation. L. R. 9 Eq. 711, 719, 721. It includes no claim to the sum insured as such. There is thus no proper analogy, in principle, to the distinction in question. This distinction has, however, to some extent, a support from English opinions upon policies which allow days of grace for the renewal or continuance of insurances in cases of lapse through default in payment of premiums within the stated periods. During the days of grace, after the expiration of the time otherwise limited, the insurer, if living, may, on payment of the premium, under certain conditions, purge his default so as to be reinstated in the insurance. But what if he dies during the same interval, without having been reinstated? After his death, can his representatives, within the days of grace, purge the default with like effect by payment of the premium and fulfilling the other conditions? On this point there have been English opinions of a strongly negative tendency. It is true that these opinions were founded, in great part, upon the language of the clause in each policy which gave the time of grace. But they were also founded, in part, upon reasons derived from considerations of the nature of contracts of life insurance. See 12 East, 183, 187; 3 C. B. (N. S.) 633, 637, 638, 640, 643, 644; also, 2 C. B. (N. S.) 257, 295, 296, which last case, however, arose upon an insurance against accidents. To avoid the effect of these opinions, an express provision has been inserted in recent English policies, that "in the event of the assured dying within the days of grace, and before payment of the premium, the policy will be held valid and effectual, and the premium will be deducted from the sum insured." See L. R. 9 Eq. 704. This may seem to imply that without such an express provision the law would be otherwise. It is not necessary to intimate an opinion as to the soundness of the distinction. We have seen that if it were necessary to reconcile the two adjudications of the supreme court as authoritative precedents, this could be done so far at least as to enable this court to follow the decision of the New York circuit court in a case precisely like it until the subject shall have been considered anew by the supreme court.

It has been suggested for the defence, but not much pressed, that there has been culpable delay on the part of the complainant, in bringing the present suit. Until his death, no definitive right of action will have accrued; but in the meantime, his invocation of the exercise of equitable jurisdiction has become proper, by reason of the forfeiture at law, and of the cancellation of the policy by the defendants, and their accountability for dividends of profits, which accountability complicates the question of equitable compensation. Therefore even if the policy had not been, as it is, a sealed one, the suit would not have been too late.

But it is not improbable that, at the present session of the supreme court, the question or questions upon which the judges were equally divided in opinion in 1874, may be authoritatively decided. This cause, if neither party shall show reason to speed it, may therefore stand over for the present, without any formal entry of a decree.

[NOTE. The affirmations of Hamilton v. Mutual Life Ins. Co., Case No. 5,986, and Tait v. New York Life Ins. Co., Case No. 13,726, in the supreme court of the United States, by a divided court, as stated in paragraph 5 of the syllabus, in the brief submitted on behalf of the defendant, and in the opinion, do not appear to have been reported. The decisions of the courts of a number of the states of the Union, as to whether or not the failure to pay premiums, where, by reason of war, the insured has been precluded from making such payments, authorizes the insurer to forfeit the policy, are not uniform. In Manhattan Life Ins. Co. v. Warwick, 20 Grat. 614; Mutual Ben. Life Ins. Co. v. Atwood, 24 Grat. 497; New York Life Ins. Co. v. Clopton, 7 Bush, 179; Statham v. New York Life Ins. Co., 45 Miss. 581; Hamilton v. Mutual Life Ins. Co., Case No. 5,986; and Martine v. International Life Ins. Co., 53 N. Y. 339,—it was held that failure of payment from such reason did not justify forfeiture of the policy, while the contrary doctrine prevails in Worthington v. Charter Oak Life Ins. Co., 41 Conn. 372; Dillard v. Manhattan Life Ins. Co., 44 Ga. 119. See, also, cases cited in briefs of counsel. But the question has been decided in favor of the right of the insurer to declare the policy forfeited by the supreme court of the United States in the cases of New York Life Ins. Co. v. Statham, New York Life Ins. Co. v. Seyms, and Manhattan Life Ins. Co. v. Buck, 93 U. S. 24, where it was held that, notwithstanding civil war between the sections of the country wherein insurance company was situated, and the insured resided, respectively, so that payment of premium could not be made, the company might insist on the condition and forfeit the policy for nonpayment, the relief of the insured being confined to a recovery of the equitable value of the policy.]